2006-NMCA-029

130 P.3d 198

**STATE of New Mexico ex rel. CHIL-
DREN, YOUTH & FAMILIES DE-
PARTMENT, Petitioner–Appellee,**

v.

**JOSEPH M., Respondent–Appellant.**

**In the Matter of Victor M. and
Dominic M., Children.**

No. 25,471.

Court of Appeals of New Mexico.

Jan. 18, 2006.

Rebecca J. Liggett, Children's Court Attorney, Children, Youth & Families Department, Santa Fe, NM, for Appellee.

Mary Jo Snyder, Santa Fe, NM, for Appellant.

## OPINION

VIGIL, Judge.

{1} The opinion filed on December 12, 2005, is hereby withdrawn, and the following opinion is substituted therefor. In other respects, the motion for rehearing is denied.

{2} Joseph M. (Father) appeals the termination of his parental rights. He argues that the district court's decision is not supported by evidence that the court could have properly found to be clear and convincing. We agree and reverse.

## BACKGROUND
### 1. NEGLECT/ABUSE PROCEEDINGS

{3} On April 25, 2003, the Children, Youth & Families Department (Department) filed a "Neglect/Abuse Petition" alleging that Father and Mother were abusing and/or neglecting their two children, Dominic M. and Victor M. Father and Mother were never married, but lived as a family unit with the children. Father is the natural father of Dominic M., and the legal father of Victor M. He agreed to have his name appear on Victor M.'s birth certificate as the father, and he is the only father Victor M. has ever known, although he is neither the biological nor adoptive father of Victor M. The Department based its allegations on numerous referrals suggesting that Father and Mother had substance abuse problems and that their children had witnessed domestic violence in the home, as well as allegations of a cigarette burn, Father's threat to beat a child, and Mother's endangering a child by holding onto him during an episode of domestic violence. Based on these allegations, the Department took the children into custody.

{4} On July 25, 2003, Father and Mother pled no contest to the allegation that their children had been neglected and/or abused, and the district court adopted the Department's findings, including a finding that the children's "[p]arents [were] not able to care for [them] in a safe and stable home due to substance use, violence, unsanitary/unsafe environment, and untreated mental health issues." As a result, the district court gave the Department temporary legal custody of the children and ordered the Department to implement its proposed treatment plans.

{5} Father's treatment plan required him to (1) "participate in an alcohol/drug assessment and follow recommendations"; (2) "participate in a domestic violence program for offenders"; (3) "participate in weekly, supervised counseling at the Department's discretion"; (4) "complete a psychological-social assessment and follow recommendations"; (5) "participate [in] and successfully complete parenting classes"; (6) "participate in family counseling when appropriate at the Department's discretion"; and (7) "furnish [the] Department with relative names and addresses

for possible placement for children and sign necessary releases."

## 2. FATHER'S INCARCERATION

{6} The "Neglect/Abuse Petition" filed by the Department did not reference any specific physical harm to the children, although the Department had also received information that the children had ingested cocaine and there were allegations of some specific harm or threats of harm contained in the application for temporary custody order. A test of the children's hair subsequently confirmed the cocaine allegation. As a result, Father was arrested on June 3, 2003, and charged with two counts of child abuse and one count of possession of drug paraphernalia. On May 4, 2004, Father pled no contest to two counts of negligently caused child abuse, and on July 13, 2004, he was sentenced to a six-year prison term with three years suspended.

{7} Father was therefore in jail for somewhat less than half of the time from the time the Department took custody of the children until the hearing on the petition to terminate parental rights. Specifically, he was in the Bernalillo County Detention Center from June 3, 2003, until September 27, 2003, and again for about a month in May 2004. Then, from the time he was sentenced on July 13, 2004, through the date of the trial on the petition to terminate parental rights, which commenced on October 26, 2004, he was in the Roswell Correctional Center. No services were made available to Father under any treatment plan during the time that Father was incarcerated. One of the State's witnesses, Jude DeMoss, testified she did not know how to go about getting services for him during that time.

## 3. EVIDENCE ON TERMINATION OF PARENTAL RIGHTS

{8} Reunification of the children with both parents was always the goal of the Department. The Department subsequently determined that reunification of the children with the parents was no longer an appropriate goal, and three days after Father was sentenced on the negligent child abuse charges, the Department moved to terminate the couple's parental rights. The decision to terminate parental rights was made in compliance with the Department's policy, described to us as follows at oral argument:

The Department does have a policy of not terminating parental rights unless it's to both parents or all people who have a legal relationship to the child in order to free the child for adoption because that's the purpose of terminating parental rights. So when the Department states and under its policy that it's not going to terminate the parental rights of mother then it's not going to go ahead and terminate the parental rights of father. That's assuming that mother is an appropriate parent for the child or the child could be returned to mother. So we're not creating a legal relationship with just the one parent and taking away the responsibilities of the other parent. And that's unless the—there's some clinical indication on the part—as far as the child is concerned that indicate that terminating the parental rights would be in their best interest without terminating all the parental rights.

{9} The State presented evidence chronicling the Department's involvement with Mother and Father at the termination hearing. Between May 2003, and the parents' termination hearing, Father received services from at least twelve individuals employed by at least five different agencies, including the Department, All Faiths Receiving Home (All Faiths), Dragonfly Services (Dragonfly), High Desert Family Services (High Desert) and the Criminal Custody Program (CCP). These individuals and entities provided a somewhat disjointed program of individual, coupled, and family services including therapy, counseling, supervised visitation, and observation. These services were frequently interrupted, transferred, or inconsistently administered due to a variety of issues including staff turnover, lack of communication by the Department with the providers about the nature of service they were to provide, incarceration of Father, refusal by providers to treat Mother due to her uncontrolled behavior, skipped visits, and a falling out between Mother and one provider.

{10} Two salient points emerged during the hearing: Mother failed to make progress

towards becoming an adequate parent while Father did make some progress. The testimony of the State's witnesses clearly established that Mother had numerous issues that interfered with her ability to properly parent her children. Jennifer Perea, a therapist employed by High Desert, testified that during her observation of the family Mother had several inappropriate and violent outbursts and that she engaged in violent play with her youngest son. At one point, Mother and her son were wielding toy guns and pretending to shoot Ms. Perea. Ron Keltner, a treatment social worker employed by the Department, testified that Mother consistently engaged in inappropriate and problematic behaviors with her children. Further, many of the witnesses who worked with Mother also noted that she made little progress toward becoming an adequate parent. In particular, Nancy Johnson, a licensed professional clinical counselor who worked with Mother and Father on parenting issues, testified that it was difficult to keep Mother on track and that she tended to become absorbed in her own issues. As a result, Mother made no progress toward becoming an adequate parent during her sessions with Ms. Johnson. In light of all the evidence concerning Mother, we affirmed the termination of her parental rights in a separately filed memorandum opinion, concluding that clear and convincing evidence supported that decision.

{11} On the other hand, nearly all of the State's witnesses acknowledged the positive progress that Father made toward becoming an adequate parent. Sheila Genoni, a parent educator and family advocate employed by All Faiths, noted that Father was very attentive and that he made good progress during his work with her. Ms. Johnson observed positive changes in Father and noted that he listened, learned, and asked some good questions. She thought that Father could learn to be an adequate parent. Jennifer Oesterling, a therapist employed by Dragonfly, agreed that, over the course of her work with the family, she saw some personal growth in Father. Jeremy Brazfield, a social worker employed by the Department, observed that Father demonstrated an interest in learning how to become a better parent and showed

some progress toward that goal. Mr. Brazfield also noted that he did not see any obvious barriers to Father learning to be an adequate parent. Netti Clegg, a licensed independent social worker employed by Dragonfly, noted that unlike the vast majority of her counseling clients, Father accepted her suggestions. Finally, Mr. Keltner testified that Father was compliant and stable during the time that Mr. Keltner had the case and that Father worked toward completing his treatment plan. He took classes on anger management, substance abuse, and parenting while he was incarcerated.

{12} The record also reveals that Father had successfully dealt with his substance abuse problems. With the exception of a disputed test in the Spring of 2004, that was never proved, all of Father's urinalysis results were negative. At the termination hearing, Father testified that he had not used drugs or alcohol since June 3, 2003. He had also been involved in Alcoholics Anonymous and Narcotics Anonymous. Ms. Oesterling testified that she found Father's claims that he had overcome his cravings for alcohol to be credible. Mr. Keltner testified that he saw no evidence that Father was drinking.

{13} To be sure, some problems were noted along with these positive observations. The State's witnesses observed that Father had several issues to resolve regarding his interaction with his children. Mr. Brazfield observed that Father had difficulty picking up on the children's verbal and non-verbal cues. Ms. DeMoss also observed that Father had difficulty relating to the children. Mr. Brazfield's opinion was that Father made "rote" progress, but not significant enough progress for Brazfield to say that there was real behavioral change. Additionally, Father acknowledged that his children had witnessed domestic violence in his home, and Father did not seem to appreciate the seriousness of the children's witnessing the domestic violence.

{14} Following the termination hearing, the district court entered an order terminating Mother and Father's parental rights. Father appeals.

## STANDARD OF REVIEW

{15} "The grounds for any attempted termination [of parental rights] shall be proved by clear and convincing evidence." NMSA 1978, § 32A-4-29(I) (2003); *In re Doe*, 98 N.M. 198, 200, 647 P.2d 400, 402 (1982). "For evidence to be clear and convincing, it must instantly tilt the scales in the affirmative when weighed against the evidence in opposition and the fact finder's mind is left with an abiding conviction that the evidence is true." *In re Adoption of Doe*, 98 N.M. 340, 345, 648 P.2d 798, 803 (Ct.App. 1982) (internal quotation marks and citation omitted). However, we will not reweigh the evidence and "we must view it in a light most favorable to affirmance." *State ex rel. Children, Youth & Families Dep't v. Vanessa C.*, 2000-NMCA-025, ¶ 24, 128 N.M. 701, 997 P.2d 833. Therefore, we must determine "whether, viewing the evidence in a light most favorable to affirming the termination of [Father's] parental rights, the [district] court could properly determine that the clear and convincing standard was met." *Id.*

## DISCUSSION

{16} In a proceeding to terminate parental rights, we "give primary consideration to the physical, mental and emotional welfare and needs of the child, including the likelihood of the child being adopted if parental rights are terminated." NMSA 1978, § 32A-4-28(A) (2005). However, a child is not "entitled to a 'better' environment than that provided by the [parent], if the one provided by the [parent] is acceptable to society." *State ex rel. Dep't of Human Servs. v. Natural Mother*, 96 N.M. 677, 681, 634 P.2d 699, 703 (Ct.App.1981). Further, "parental rights are among the most basic rights of our society and go to the very heart of our social structure." *In re Doe*, 98 N.M. at 200, 647 P.2d at 402 (internal quotation marks and citation omitted). Therefore, a parent's rights may not be terminated simply because "a child might be better off in a different environment." *State ex rel. Children, Youth & Families Dep't v. Patricia H.*, 2002-NMCA-061, ¶ 21, 132 N.M. 299, 47 P.3d 859 (internal quotation marks and citation omitted).

{17} Father's parental rights were terminated on grounds that he abused or neglected his children as provided in the Abuse and Neglect Act, NMSA 1978, §§ 32A-4-1 to -33 (1993, as amended through 2005). Before the court may terminate parental rights based on abuse or neglect, it must find

(1) that the children were abused or neglected, (2) that the conditions and causes of the abuse and neglect were unlikely to change in the foreseeable future, and (3) that the [Department] made reasonable efforts to assist [Father] in adjusting the conditions which rendered [him] unable to properly care for the children.

*In re Termination of Parental Rights of Eventyr J.*, 120 N.M. 463, 467, 902 P.2d 1066, 1070 (Ct.App.1995).

{18} Father concedes that the district court properly concluded that his children had been neglected and/or abused, but contends that termination of his parental rights was not supported by sufficient evidence because the latter two requirements were not met. We agree.

{19} From the inception, the treatment goal of the Department was reunification of the children with both parents. As such, Mother and Father were treated as a unit, and consistent with the treatment plans, Father was "committed" to Mother "and to the reunification of their family." In fact, treatment providers noted that Father was determined to make things work with Mother because she needed help and he did not want to abandon her, "abandonment" being a huge issue and problem for her. As we have already noted, Mother failed to become an adequate parent despite the substantial efforts of the Department to help her for over a year. When the Department decided to change the permanency plan of the children from reunification to termination of parental rights and adoption, it described Father's "lack of progress" as centering on his "primary motivations" being his desire to help Mother have a family rather than be a good parent or attend to the safety needs of the children. On appeal, the Department continues to argue that "Mother's presence in the

home is a threat to the well-being of Children," and that "it is clear that Father had no intention of raising Children without Mother." The Department asserts, "[p]erhaps the most dangerous condition that Father was unable or unwilling to remedy is the presence of Mother in the home." However, the option of raising the children without Mother was never included as a goal in any of the treatment plans adopted by the Department or ordered by the court for Father.

{20} The Department has a statutory duty it must perform before parental rights may be terminated because of abuse and neglect. That duty is to engage in "reasonable efforts" to "assist the parent in adjusting the conditions that render the parent unable to properly care for the child" unless certain exceptions, not applicable here, are present. Section 32A–4–28(B)(2). Whether the Department has made reasonable efforts "var[ies] with a number of factors, such as the level of cooperation demonstrated by the parent and the recalcitrance of the problems that render the parent unable to provide adequate parenting." *Patricia H.*, 2002–NMCA–061, ¶ 23, 132 N.M. 299, 47 P.3d 859. When a parent is in an abusive relationship and the abuser is obviously and physically harming the children, parental rights can be terminated of the parent who is doing nothing to prevent the abuse. *See In re I.N.M.*, 105 N.M. 664, 668–69, 735 P.2d 1170, 1174–75 (Ct.App.1987) (involving a partner who beat the child). However, when the behavior of the parent's partner is more subtle, such that it is difficult for a person of ordinary intelligence and sensibilities to realize that the partner's self-centeredness or other characteristic is harming the children, we believe that more is required of CYFD than simply expecting the parent to know and appreciate the harm being caused. We deem it noteworthy that no treatment plans were ever formulated or implemented in this case for Father to separate from Mother and raise the children without Mother. *Compare In re D.L.S.*, 230 Neb. 435, 432 N.W.2d 31, 37 (1988) (pointing out that the plan required the mother to decide what to do about her relationship with her husband who was abusive toward her and the child, and she divorced him). In fact, Father was never specifically and pointedly told that a failure to separate from Mother could constitute a basis for terminating his rights as a parent because that relationship rendered him unable to properly care for his children.

{21} The only evidence that was introduced on this question was the following. Mr. Keltner, a treatment social worker with the Department, was asked whether the issue ever came up that Father would be able to function as a parent on his own. His response was that Mother and Father held themselves out as a couple and it was never mentioned to him that Mother and Father were planning on separating, and one or the other taking primary parental responsibility. Mr. Brazfield, a social worker with the Department, was asked whether there was ever an attempt on the part of the Department to assist Father to live independently of Mother. His negative answer was that the reference was made for both parents, and that both parents were dealt with as a unit instead of separately except when Father was incarcerated and Mother was treated alone. When he was asked whether he had any discussion with Father about his choice to remain with Mother, he only answered, without elaboration, "We talked about it, yes." Mr. Brazfield later testified that it was suggested to Father that he might have a better chance of regaining custody if he were not with Mother. Ms. Johnson, the licensed parental counselor assigned to provide treatment, testified that the "gate was not open" for Father to have adequate parenting skills if he was not willing to raise the children without Mother, but she never told him she needed to see him separately. Further, she was "not sure" whether it would have "left the gate open" if she had worked with Father individually, although "it was certainly possible" for Father to have developed "adequate parenting skills."

{22} We are not persuaded that the foregoing evidence was sufficient to put Father on notice that his relationship with Mother was a condition and cause of the abuse and neglect of his children which had to end for him to be able to parent his children. *See In re Mainor T.*, 267 Neb. 232, 674 N.W.2d 442, 461 (2004) (stating that a plan must "correct,

eliminate, or ameliorate" the condition on which the adjudication is based) (internal quotation marks and citation omitted). Nor are we persuaded that the Department's actions can be construed as a reasonable effort to assist Father. Instead, the record reveals that the Department treated Mother and Father as a unit. Importantly, there was no evidence of any specific discussion with Father indicating that he would have to leave Mother to become a successful parent and no part of the treatment plan listed this factor as an element. We conclude that the record does not contain evidence that the district court could have properly found to be clear and convincing that the Department made reasonable efforts to help Father terminate his relationship with Mother so he could become an adequate parent.

{23} We therefore hold that the district court could not have found that the clear and convincing standard was met when it ultimately found that "it is unlikely that [Father] will be able to properly parent the children in the foreseeable future." Under the circumstances of this case, where the social workers agreed that Father was motivated to comply with the Department and made some steps to improve his parenting skills, and where the problem was mainly with Mother, although it was understandable that a person in Father's position might not appreciate this, it was incumbent on the Department to have a specific treatment plan or specifically alert Father to the consequences of his staying with Mother. Absent that happening, the district court could not have properly found that the clear and convincing standard was met under the facts of this case. Therefore, we reverse.

{24} **IT IS SO ORDERED.**

WE CONCUR: LYNN PICKARD and IRA ROBINSON, Judges.