This decision was not selected for publication in the New Mexico Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Please also note that this electronic decision may contain computer-generated errors or other deviations from the official paper version filed by the Supreme Court and does not include the filing date.

# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**IN THE MATTER OF MARIO F., a child,**

**STATE OF NEW MEXICO, ex rel.**
**CHILDREN, YOUTH AND FAMILIES DEPARTMENT,**

Petitioner-Respondent,

v.                                                                    NO.  32,545

**OCTAVIO F.,**

Respondent-Petitioner.

**ORIGINAL PROCEEDING ON CERTIORARI**
**Monica M. Zamora, District Judge**

Caren Ilene Friedman
Santa Fe, NM

for Petitioner

Rebecca J. Liggett
Santa Fe, NM

for Respondent

**DECISION**

**Daniels, Chief Justice.**

Octavio F. (Father) appeals the district court's judgment terminating his parental rights to his son, Mario F. (Child), arguing that the judgment should be reversed because Father had complied with his treatment plan and alleviated the causes and conditions of neglect that brought Child into state custody. The Children, Youth and Families Department (CYFD) argues that clear and convincing evidence supports the district court judgment. The Court of Appeals upheld the district court. *See State ex rel. Children, Youth & Families Dep't v. Octavio F.* (*In re Mario F.*), No. 29,469, slip op. (N.M. Ct. App. July 22, 2010). We conclude that CYFD presented insufficient evidence at the termination of parental rights hearing to support the district court's finding that the causes and conditions of neglect were unlikely to change in the foreseeable future. Acting within this Court's discretion under Rule 12-405(B)(1) NMRA to dispose of a case by unpublished decision rather than formal opinion where the "issues presented have been previously decided" by this Court, we enter this Decision reversing the district court and the Court of Appeals.

**Facts and Proceedings Below**

Child was taken into custody in September 2005 after police found him wandering near the intersection of Juan Tabo Boulevard and Lomas Boulevard in

Albuquerque at approximately 8:00 a.m. Child was four years old at the time and was unable to tell the officers where he lived. After the police had recovered Child, Father flagged them down, explaining that he was looking for his missing son. Initially Father told the officers that Child had climbed out of a window while Father was asleep, but Father later admitted that he had left Child alone when he went to work the night before.

CYFD alleged in the Neglect/Abuse Petition that (1) Father left Child home alone while Father went to work, (2) Father's house was dirty, and (3) there was no food in the house. The district court entered a custody order in October 2005, granting legal custody of Child to CYFD and providing that Father should have regular visits with Child. Father entered a plea of no contest to charges of neglect at the November 2005 adjudicatory hearing. The district court ordered Father to participate in a parenting treatment program and undergo mental health, domestic violence, and substance abuse assessments.

In December 2005, CYFD filed a "Judicial Review and/or Permanency Hearing Report" stating that Father had "completed all current assessments," was visiting Child three times a week, was meeting his treatment plan objectives, and appeared "extremely bonded with" and "able to parent" Child. "Reunification" was the report's sole recommended permanency plan.

CYFD filed a second report in August 2006 stating that although Father had "participated in the majority of his treatment plan items," CYFD and some of Father's service providers were concerned that Father had "learned very little from his services, or that he does not/cannot demonstrate the expected positive behavior changes." The report indicated that Father had been "uncooperative, oppositional, and unpleasant to CYFD personnel and other providers alike." The report also indicated that Father had "stated, on more than one occasion, that the State has no right to tell him or [Child] what to do because there was no justified reason for [Child] being taken from his custody in the first place." The report also noted that the frequency of Father's supervised visits had been reduced to twice weekly, in part because of Father's "inappropriate behavior with [Child] during visits." The August 2006 report listed reunification as the recommended permanency plan but included adoption as a concurrent permanency plan.

CYFD continued to recommend reunification in a third report filed in July 2007. According to the report, Father had "been very compliant with his treatment plan items," had "made significant progress towards the desired outcomes and towards alleviating the causes of placement," and was "highly motivated to regain custody of" Child. Supervised visits and family therapy sessions were "going well," and CYFD had "no safety concerns" at that time.

Because Father had "proven he can be fairly adept at child rearing with minimal safety concerns," CYFD decided to schedule a six-month trial home visit beginning in late July 2007. By then, Child had been in CYFD custody for almost two years. On the day after the first overnight home visit, Child ran out into the street. Father spanked Child to discipline him, and the incident resulted in a long scratch on Child's back, apparently from Father's attempt to stop Child by grabbing his shirt. When a social worker protested the spanking because Father had done it out of anger, Father responded that he had a right to spank his own child. CYFD ended the trial home visit after this incident, concerned that the spanking demonstrated Father's inability to put the training he had been receiving into practice.

Soon after the July 2007 trial home visit abruptly ended, CYFD changed its recommended permanency plan from reunification to adoption. In November 2007, CYFD reported that Child had become afraid of Father and that adoption would be in Child's best interest. The district court adopted CYFD's recommendation and changed the permanency plan from reunification to termination of parental rights and adoption.

CYFD moved to terminate Father's parental rights in May 2008. The termination of parental rights hearing was held on July 10, 2008, and continued on

November 21, 2008. Various social workers and other witnesses testified. The evidence indicated that Father had cooperated with CYFD, followed his treatment program, improved his parenting skills, and attended his therapy sessions. A therapist who had worked with Father and Child testified that Father had learned from his mistakes, understood that he could not leave Child alone, and knew why spanking Child during the trial home visit had been wrong. Despite these improvements, however, caseworkers testified that Father had not made the kind of progress CYFD wanted to see at that stage. Some witnesses believed Child should be reunited with Father. Two caseworkers opined that adoption was in Child's best interest.

After the parties made their closing remarks at the November portion of the hearing, the court remarked, "This is a difficult one." The court went on to say that, if the hearing had been finished in July, "it wouldn't have been a difficult decision." Although expressing doubts, the court seemed to conclude that Father had made significant progress between July and November. The court was concerned that CYFD had not identified an adoptive family for Child and that Child's "high needs" required finding a family for him soon. The court indicated that it wanted to see how Father would do "in the unstructured setting" of his own home because that would be "indicative of whether or not he can truly make the changes." The court

specifically refused to make CYFD's suggested finding that termination was warranted and instead held the entry of judgment in abeyance. The court invited CYFD to provide a status report in the future and promised to hold a hearing if problems arose in the meantime.

The court held a "Subsequent Permanency Hearing" on January 28, 2009, which was attended by several social workers, CYFD, Father's attorney, an interpreter, and the guardian ad litem. The court began the hearing before Father arrived because the interpreter was only available for a limited period of time. In its opening remarks, CYFD encouraged the court to issue a decision that day, explaining that "significant events ha[d] transpired" since the last hearing. CYFD had already described these events in a report filed with the court and offered to present witness testimony verifying the statements in that report. CYFD proposed findings of fact and asked the court to terminate Father's parental rights.

After hearing CYFD's opening remarks, Father's attorney objected to CYFD's findings of fact and to the conduct of a "full evidentiary hearing" because Father did not have an opportunity to speak to the witnesses, did not have notice of their testimony, had just received CYFD's progress report that day, and had not prepared for any kind of evidentiary hearing. Father's attorney also objected to being unable "to explain to [Father] what we're really going over." Father's

attorney renewed her objections when Father arrived, nine minutes into the forty-nine minute hearing. The court responded, "We're not doing an evidentiary hearing, I just want to know what the progress is. We're not going to go that far." Counsel for CYFD interjected, saying "I don't think the court was contemplating an evidentiary hearing, the evidentiary part of this is over. . . . I think [the court] wanted to hear from providers how things were going in the house." Father's attorney objected to CYFD's proposed presentation of "evidentiary testimony" from service providers without first providing a witness list to Father.

Despite Father's objections, the court allowed CYFD to present "nonevidentiary" testimony by multiple social workers and agency employees who related individual events in which Father had been unsafe or neglectful with Child, and who gave opinions to the effect that Father was not making any progress and should lose his parental rights. Father then made a brief statement expressing his dedication to the reunification process, his desire to improve, and his belief that he could be a good parent. After the presentation of this testimony, the court made findings of fact on the record that Child had been neglected, that CYFD had made reasonable efforts to address the causes and conditions of neglect, and that despite those efforts, Father had not alleviated the causes of neglect. Father's attorney objected to an order to terminate, arguing that the State finished presenting its case

8

against Father in November and that the January hearing did not afford Father the opportunity to present evidence or cross-examine the witnesses against him.

On February 24, 2009, the court entered judgment terminating Father's parental rights and adopting CYFD's proposed findings of fact and conclusions of law as its own. The court's findings of fact included an entire page devoted to information presented only at the January 2009 "nonevidentiary" hearing. Immediately after listing the findings of fact detailing the information brought before the court at that hearing, the court made this additional finding: "The court having heard these reports concluded that [Father's] parental rights should be terminated." This finding confirmed that the court relied on information presented at the January 2009 hearing when it decided to terminate Father's parental rights.

The Court of Appeals affirmed the district court's order terminating Father's parental rights, concluding that (1) despite Father's compliance with the treatment plan, he had not changed the conditions and causes of the neglect, and (2) the district court's conclusion was based on clear and convincing evidence justifying the termination of parental rights. *Octavio F.*, No. 29,469, slip op. at 14-15.

**Discussion**

CYFD had the burden of proving the grounds for terminating Father's parental rights by clear and convincing evidence. NMSA 1978, § 32A-4-29(I)

9

(2005) (amended 2009). "The clear and convincing evidence standard requires proof stronger than a mere 'preponderance' and yet something less than 'beyond a reasonable doubt.'" *Lee v. Lee* (*In re Adoption of Doe*), 100 N.M. 764, 767, 676 P.2d 1329, 1332 (1984) (internal quotation marks and citation omitted). Clear and convincing evidence is that which "instantly tilt[s] the scales in the affirmative when weighed against the evidence in opposition and the fact finder's mind is left with an abiding conviction that the evidence is true." *Id.* (internal quotation marks and citation omitted).

"The function of the appellate court is to view the evidence in the light most favorable to the prevailing party, and to determine therefrom if the [district court] could properly have reached an abiding conviction as to the truth of the fact or facts found." *State ex rel. Children, Youth & Families Dep't v. Lance K.* (*In re Emily K.*), 2009-NMCA-054, ¶ 16, 146 N.M. 286, 209 P.3d 778 (internal quotation marks and citation omitted).

When determining whether clear and convincing evidence supports the termination of parental rights, the district court must rely on evidence presented at the termination of parental rights hearing. Because parents have a constitutional right to retain custody of their children, termination of parental rights hearings "must be conducted with scrupulous fairness," *Ronald A. v. State ex rel. Human Servs.*

*Dep't* (*In re Ronald A.*), 110 N.M. 454, 455, 797 P.2d 243, 244 (1990), and must adhere to the rules of evidence, *see* Rule 10-141 NMRA; Rule 11-1101 NMRA. The parties in a termination proceeding must have "notice of the issues . . . to be determined and opportunity to prepare and present a case on the material issues." *Ronald A.*, 110 N.M. at 455, 979 P.2d at 244 (internal quotation marks and citation omitted). The parent "has the right under due process to a fair opportunity to be heard and to present a defense," including an "opportunity for meaningful participation." *State ex rel. Children, Youth & Families Dep't v. Mafin M.* (*In re Chance M.*), 2003-NMSC-015, ¶ 21, 133 N.M. 827, 70 P.3d 1266 (internal quotation marks and citation omitted).

The findings of fact the district court made in this case included at least a page of factual information that was brought to the court's attention on January 28, 2009, at what the court repeatedly confirmed was a nonevidentiary hearing. To the extent that the court relied on information outside the evidentiary record to terminate Father's parental rights, the district court erred. We will not, however, reverse the district court if sufficient record evidence supports the district court's judgment terminating Father's parental rights. *See Normand v. Ray*, 109 N.M. 403, 411, 785 P.2d 743, 751 (1990) ("Even where specific findings adopted by the trial court are shown to be erroneous, if they are unnecessary to support the judgment of the court

11

and other valid material findings uphold the trial court's decision, the trial court's decision will not be overturned."); *see also State ex rel. Children, Youth & Families Dep't v. Brandy S. (In re Nicholas S.)*, 2007-NMCA-135, ¶¶ 28, 33, 142 N.M. 705, 168 P.3d 1129 (upholding termination of parental rights where the district court's findings of fact were "independently established by the testimony at the [termination of parental rights] hearing"). Our review of this case will consider only evidence of record presented to the court at the termination of parental rights hearing that concluded on November 21, 2008.

In order to terminate Father's parental rights, the district court needed to make three specific factual findings: (1) that Child "has been . . . neglected or abused," (2) "that the conditions and causes of the neglect and abuse are unlikely to change in the foreseeable future," and (3) that CYFD has made "reasonable efforts . . . to assist [Father] in adjusting the conditions that render [Father] unable to properly care for [C]hild." NMSA 1978, § 32A-4-28(B)(2) (2005); *see State ex rel. Children, Youth & Families Dep't v. Joseph M. (In re Victor M.)*, 2006-NMCA-029, ¶ 17, 139 N.M. 137, 130 P.3d 198. Father disputes that the second factual finding was supported by clear and convincing evidence.

Father argues that he complied with his treatment plan and alleviated all causes and conditions of neglect specified in the Neglect/Abuse Petition, including

leaving Child home alone, having a dirty house, and having no food in the house. A parent's compliance with a CYFD-crafted treatment program may support a factual finding that the causes and conditions of neglect have changed or are likely to change in the foreseeable future. *See, e.g.*, *Lance K.*, 2009-NMCA-054, ¶¶ 36-37; *Joseph M.*, 2006-NMCA-029, ¶¶ 10-12, 17-18.

In *Lance K.*, the Court of Appeals reversed the district court's order terminating a father's parental rights to his children, noting his "substantial compliance with his treatment plan and progress toward change." 2009-NMCA-054, ¶¶ 37, 64. *Lance K.* concluded that the conditions that brought the children into CYFD custody had been resolved prior to the termination of parental rights hearing, *id.* ¶¶ 29, 32, and that CYFD inappropriately relied on evidence of events that had occurred nearly four years before the court terminated the father's parental rights, *id.* ¶ 32. The Court held that CYFD had not "presented clear and convincing evidence that the causes and conditions of neglect were unlikely to change in the foreseeable future." *Id.* ¶ 37.

In *Joseph M.*, the father followed his treatment plan and made positive progress toward becoming an adequate parent, but the mother made little progress. 2006-NMCA-029, ¶¶ 10-11. CYFD argued that the father was not an adequate parent because he failed either to recognize that the mother posed a threat to the

13

children or to remedy the presence of the mother in the home. *Id.* ¶ 19. The Court of Appeals reversed the termination of the father's parental rights because there was insufficient evidence that Father had "notice that his relationship with [the m]other was a condition and cause of the abuse and neglect of his children which had to end for him to be able to parent his children." *Id.* ¶¶ 22-23.

A parent's compliance with a treatment plan does not automatically preclude a court from making a factual finding that the causes and conditions of abuse or neglect are unlikely to change. *See, e.g.*, *State ex rel. Children, Youth & Families Dep't v. Athena H. (In re Charles H.)*, 2006-NMCA-113, ¶ 9, 140 N.M. 390, 142 P.3d 978. If a parent is unable to make the changes necessary to become an adequate parent despite reasonable efforts to comply with a treatment plan, the district court may appropriately conclude that termination is justified. *Id.* The district court in *Athena H.* concluded that the mother "had given her best effort to comply with the treatment plan," but the court terminated her parental rights because she had severe unresolved psychological problems and had caused her children severe injury while they were in her care. *Id.* The Court of Appeals upheld the termination of parental rights, explaining that "CYFD was entitled to act in the children's best interest." *Id.* ¶ 13 (citing NMSA 1978, § 32A-1-3(A) (1999) ("A child's health and safety shall be the paramount concern. Permanent separation of

14

a child from the child's family, however, would especially be considered when the child or another child of the parent has suffered permanent or severe injury or repeated abuse.")).

CYFD argues that although the conditions of neglect specified in the Neglect/Abuse Petition may have been alleviated, Father's inability to provide a safe and structured environment for Child is the underlying cause of the neglect and is unlikely to change in the foreseeable future. CYFD explains that Child needs a specific type of parenting, and that given Child's special needs, Father is not an adequate parent. However, Child's special needs have nothing to do with the conditions of neglect that justified CYFD taking custody of Child to begin with. Father's parental rights cannot be terminated merely because another family might be better at addressing Child's special needs. *See Joseph M.*, 2006-NMCA-029, ¶ 16 ("[A] parent's rights may not be terminated simply because a child might be better off in a different environment." (internal quotation marks and citation omitted)). A parent is required to be adequate, not perfect.

CYFD also argued that Father should have known not to use physical discipline to correct Child. CYFD concedes that parents have a right to implement reasonable physical discipline in New Mexico but asserts that Father should have realized that spanking this particular child was inappropriate. Significantly,

15

however, a therapist who had worked with Father testified that Father learned that physical discipline was not the appropriate way to correct Child's behavior. Nothing in the record indicates that Father has physically disciplined Child after being told that CYFD thought spanking this child constituted abuse.

It is unclear what specific changes CYFD expected Father to make in order to alleviate the alleged causes of neglect. Father substantially complied with the treatment plan established by CYFD and has continually expressed his interest in raising Child even after five and a half years of separation. The evidence presented at the termination of parental rights hearing did not establish that Father failed to implement expected changes of which Father had notice. *Compare Joseph M.*, 2006-NMCA-029, ¶ 22 (concluding that the father could not have been expected to know "that his relationship with Mother was a condition and cause of the abuse and neglect of his children"), *with Athena H.*, 2006-NMCA-113, ¶ 5 (finding that further CYFD efforts were unlikely to remedy the mother's mental health issues, the underlying cause of abuse and neglect).

**Conclusion**

The evidence of record introduced at the termination of parental rights hearing failed to prove by clear and convincing evidence the required statutory justification for terminating Father's parental rights. We reverse the judgment terminating

16

Father's parental rights and remand this case to the district court for further appropriate proceedings in accordance with this Decision.

    IT IS SO ORDERED.


                                            _____
                                            **CHARLES W. DANIELS, Chief Justice**


**WE CONCUR:**



_____
**PATRICIO M. SERNA, Justice**




_____
**PETRA JIMENEZ MAES, Justice**




_____
**RICHARD C. BOSSON, Justice**




_____
**EDWARD L. CHÁVEZ, Justice**