This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**No. A-1-CA-39510**

**STATE OF NEW MEXICO ex rel. CHILDREN, YOUTH & FAMILIES DEPARTMENT,**

Petitioner-Appellee,

v.

**TYIA F.,**

Respondent-Appellant,

and

**PAUL R.,**

Respondent,

**IN THE MATTER OF AALIYIAH F.,**

Child.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**William E. Parnall, District Judge**

Children, Youth & Families Department
Rebecca J. Liggett, Chief Children's Court Attorney
Robert Retherford, Children's Court Attorney
Santa Fe, NM

for Appellee

Law Offices of Nancy L. Simmons, P.C.
Nancy L. Simmons
Albuquerque, NM

for Appellant

Deborah Gray Law, LLC
Deborah Gray
Albuquerque, NM

Guardian Ad Litem

## DECISION

**HENDERSON, Judge.**

**{1}**     The district court terminated the parental rights of Tyia F. (Mother) and Paul R. (Father) (collectively, Parents) to A.F. (Child). Mother appeals, and we affirm.

## BACKGROUND

**{2}**     In late 2017, following an emergency referral from the Albuquerque Police Department (APD), the New Mexico Children, Youth and Families Department (CYFD) filed a neglect/abuse petition against Parents[1] and took custody of Child. CYFD alleged that Mother continuously abused substances and exposed Child to domestic violence. Following a custody hearing, the district court ordered Mother to participate in domestic violence, drug and alcohol, mental health, parenting, and psychosocial assessments, as well as drug and alcohol testing.

**{3}**     In January 2018, the district court held an adjudicatory hearing. On the first day of the hearing, APD Officer Joann Lopez testified that APD had responded to three calls in reference to Parents in less than twenty-four hours, two of which came from individuals not associated with Parents. Mother made the most recent call to APD, and alleged that Father, who had fled the residence, stabbed her with a pen. Officer Lopez observed a small wound on Mother's side and a bruise on the side of her face. The residence belonged to Father's parents, and Mother described her and Father as "homeless" when they were not staying there. Mother further described Father as "abusive." Mother refused Officer Lopez's efforts to take her and Child away from the residence. Officer Lopez contacted CYFD, which prompted Mother to leave Child in the care of Father's parents and flee the residence.

**{4}**     The adjudicatory hearing resumed the following month. After the district court received further testimony, Mother eventually pled "no contest" to neglect of Child, as defined in NMSA 1978, Section 32A-4-2(G)(2) (2017, amended 2018) (defining a " 'neglected child' " as one "who is without proper care and control of subsistence, education, medical or other care or control necessary for the child's well-being because of the faults or habits of the child's parent . . . or the failure or refusal of the parent . . . when able to do so, to provide them"). Mother stipulated to the following factual basis for her plea: "[Mother] has unresolved issues with criminal activity in the home, due to

---

1Only the termination of Mother's parental rights to Child is at issue in this appeal. Accordingly, our discussion of Father's involvement in this case is limited to the facts relevant to Mother's claims on appeal.

domestic violence with [Father] and parenting that negatively impact her judgment and decision-making as it relates to ensuring [C]hild's safety and well-being. [Mother] has failed to demonstrate sufficient protective capacities to ensure [C]hild's safety and well-being." CYFD prepared a case plan for Parents. In reference to Parents' relationship, the district court provided the following warning:

> If you can't [be together] and you realize that, what I'll tell you is that if one of you is working the . . . plan and is ok, and if the other one is not, then neither one of you can get [Child] back unless you're not together. So, just remember that you both need to be working the plan or you need to be working it separately.

**{5}** The district court held an initial judicial review hearing in April 2018. At that time, CYFD reported, and the district court found, that: Mother missed counseling appointments and drug tests, and failed to participate in a psychological evaluation, attend parent orientation, and "maintain[] an environment free from domestic violence." The district court noted its duty to caution Mother concerning her relationship with Father as it related to Parents' case plan, and gave her the following warning: "If [Father] has a problem, but you're working the plan, [Child] can't go back to you." Child's guardian ad litem also spoke on the record about how Parents' relationship may hinder one parent's ability to reunify with Child.

**{6}** In October 2018, the district court held an initial permanency hearing. The district court found that, by that time, Mother had yet to participate in a psychological evaluation, attend parent orientation, or consistently attend counseling, as required by the case plan. The district court further found that Mother had missed eighteen drug tests, tested positive for methamphetamine, and failed to appear for a meeting with her permanency planning worker (PPW). CYFD reported that it had referred Parents to couple's therapy. The district court inquired into Parents' relationship status, and was informed that they were still a couple. The district court again warned that "if one parent is not following the plan, [Child] can't go back to either parent or to both parents together if they're together."

**{7}** Parents appeared for a subsequent permanency hearing in December 2018. The district court found that, by that time, Mother had missed twenty-two drug tests, had yet to participate in a psychological evaluation or attend parent orientation, had been discharged from one counseling service as a result of noncompliance, had failed to appear at a new counseling service, and had failed to complete new assessments for anger management and domestic violence. CYFD again informed the district court that it had referred Parents to couple's therapy.

**{8}** At a subsequent permanency hearing, held approximately six months later, Mother outlined the progress she was making in domestic violence counseling, and CYFD expressed its position that Mother was making "reasonable progress" on the case plan.

**{9}** In July 2019, Child's guardian ad litem filed a motion to terminate Parents' parental rights to Child. CYFD gave notice to the district court of its intent to litigate the motion, but moved to delay a termination of parental rights trial (TPR trial) as it believed that, given Parents' progress on their case plan, reunification with Child may be possible. At that time, Parents were still a couple.

**{10}** At a subsequent permanency hearing six months later, however, CYFD noted inconsistent participation in the services provided to Parents. The hearing further revealed that though Parents had been participating in couple's therapy, they had recently ended their relationship. CYFD reported, and the district court found, that there had been new instances of domestic violence between Parents, and that Mother had continued to miss drug tests, had declined to participate in a meeting to discuss Child's mental health assessment, and had signaled an unwillingness to comply with what "[would] be asked of her moving forward." Mother's attorney noted that the instability and uncertain nature of Parents' relationship was hindering reunification with Child, and the district court echoed this warning.

**{11}** In September 2020, the case proceeded to a TPR trial. The district court took judicial notice of its factual findings regarding Parents' progress and compliance with their case plan from three separate hearings.[2] The following evidence was presented at trial.

**{12}** Three APD Officers testified regarding incidents of domestic violence involving Parents. Their testimony detailed an incident between Parents in which the primary aggressor could not be determined, another during which both Parents exhibited aggressive behavior toward police officers, and yet another where Mother was uncooperative with police and refused a domestic violence paperwork packet.

**{13}** Child's psychotherapist offered expert testimony concerning Child's mental health. She testified that she diagnosed Child with post-traumatic stress disorder stemming from contact with police officers. Child's psychotherapist stated that it was clinically unnecessary for her to consult with Parents while treating Child. She further testified that Child is "high risk" for negative mental and behavioral health outcomes due to her adverse childhood experiences. She opined that Child needed one more year of psychotherapy, at a minimum, and a permanent custody situation "as quickly as possible," and noted that she would be "very concerned" for Child if Parents regained custody.

**{14}** A clinical psychologist (the CP), who provided services to Parents and Child, offered expert testimony in psychology. The CP testified that she offered recommendations to Parents as a couple and encouraged both of them to separately engage in therapy tailored to their individual needs. The CP further testified that because Parents could not acknowledge that Child was in a dangerous environment prior to CYFD taking custody of Child, Parents were unable to participate in all aspects of Child's therapy. Additionally, the CP detailed Parents' denials of domestic violence,

---

[2]These findings were from the hearings that took place in April 2018, October 2018, and December 2018.

substance abuse, the stressful impact of their actions on Child, and the need for support for them to maintain sobriety. The testimony of the CP included details of her observations of Father's "intimidating," "scary," and "unsafe" behavior, and both Parents' inadequate responses to it. The CP further testified that, following assessments with her, Parents did not engage in any recommended treatment, and Mother cancelled and never rescheduled an appointment to review Mother's assessment. Finally, according to the CP, in an individual meeting with Father, he acknowledged domestic violence in his relationship with Mother and claimed that Mother was using drugs.

{15}     Parents' original PPW testified that he was aware of ongoing domestic violence between Parents, and that during his meetings with Parents, Father would "curse" at Mother and engage in threatening behavior, such that the PPW felt it necessary to have a security guard present. He further testified that Mother downplayed Father's behavior. Finally, the PPW detailed how Mother missed counseling classes, assessments, and drug tests, including a psychological evaluation rescheduled by CYFD.

{16}     Parents' most recent PPW testified that at the time she met with them, Parents were still a couple and had falsely claimed to have completed all requirements of their case plan. She testified that Parents expressed an unwillingness to continue work on their case plan. The PPW further testified regarding domestic violence between Parents and their failure to adequately address this issue, including an incident where both Parents initially placed blame elsewhere before admitting that the incident was indeed between them. According to the PPW, over the course of her meetings with Parents, she made efforts to understand their relationship status, as they would vacillate between remaining a couple and separating.

{17}     The PPW testified that Parents ended their relationship by June 2020, which prompted CYFD to begin meeting with Mother and Father separately, and arranging separate visits between each of them and Child. Additionally, according to her testimony, the PPW ensured that Mother was enrolled in individual counseling and referred Mother to a domestic violence program. The PPW further testified that after Parents' separation, CYFD had difficulty maintaining contact with Mother and that Mother declined participation in services offered to her by CYFD to aid Mother in her struggles with the separation, missed calls for drug testing, and failed to communicate with her therapist. Finally, the PPW testified that she offered assistance to Mother to find housing.

{18}     Child's foster mother testified that she and her husband were willing to adopt Child. She further detailed incidents of concerning behavior by Mother and Father. As to Mother, Child's foster mother recounted that over video visits with Child, Mother showed Child a chainsaw and a bottle of pepper spray.

{19}     Mother and Father were the final witnesses to testify. Following the close of evidence, the district court terminated Parents' parental rights to Child. Mother appeals.

**DISCUSSION**

**{20}** On appeal, Mother contends that CYFD did not prove by clear and convincing evidence that (1) CYFD made reasonable efforts to reunify Mother and Child; and that (2) Mother had not ameliorated the conditions and causes of neglect, or would not do so in the foreseeable future. We disagree and explain.

## The Termination of Mother's Parental Rights Is Supported by Clear and Convincing Evidence

**{21}** The motion to terminate Mother's parental rights to Child was brought pursuant to NMSA 1978, Section 32A-4-28(B)(2) (2005), which states, in relevant part:

> The court shall terminate parental rights when . . . the child has been a neglected or abused child as defined in the Abuse and Neglect Act and the court finds that the conditions and causes of the neglect and abuse are unlikely to change in the foreseeable future despite reasonable efforts by [CYFD] or other appropriate agency to assist the parent in adjusting conditions that render the parent unable to properly care for the child.

The grant of a motion to terminate parental rights is appropriate only if the conditions in Section 32A-4-28(B)(2) are proven by clear and convincing evidence. NMSA 1978, § 32A-4-29(I) (2009). "For evidence to be clear and convincing, it must instantly tilt the scales in the affirmative when weighed against the evidence in opposition and the fact[-]finder's mind is left with an abiding conviction that the evidence is true." *State ex rel. Children, Youth & Families Dep't v. Joseph M.*, 2006-NMCA-029, ¶ 15, 139 N.M. 137, 130 P.3d 198 (internal quotation marks and citation omitted).

**{22}** Our review is limited to ascertaining "whether, viewing the evidence in the light most favorable to the prevailing party, the fact[-]finder could properly determine that the clear and convincing evidence standard was met." *In re Termination of Parental Rights of Eventyr J.*, 1995-NMCA-087, ¶ 3, 120 N.M. 463, 902 P.2d 1066. "[W]e will not reweigh the evidence[.]" *Joseph M.*, 2006-NMCA-029, ¶ 15. With this in mind, our task is to determine whether the result below "is supported by substantial evidence, not whether the [district] court could have reached a different conclusion." *In re Ernesto M., Jr.*, 1996-NMCA-039, ¶ 15, 121 N.M. 562, 915 P.2d 318. "Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support a conclusion." *State ex rel. Children, Youth & Families Dep't v. Raymond D.*, 2017-NMCA-067, ¶ 14, 404 P.3d 15 (internal quotation marks and citation omitted).

**{23}** In assessing the district court's determination that CYFD proved by clear and convincing evidence that it made reasonable efforts to reunify Mother and Child, we employ an approach that considers the totality of the circumstances underlying the district court's decision. *See State ex rel. Children, Youth & Families Dep't v. Keon H.*, 2018-NMSC-033, ¶ 41, 421 P.3d 814. This approach demands that we eschew reassessing any single factor on its own. *State v. Martinez*, 2018-NMSC-007, ¶ 12, 410 P.3d 186. "What constitutes reasonable efforts may vary with a number of factors, such as the level of cooperation demonstrated by the parent and the recalcitrance of the

problems that render the parent unable to provide adequate parenting." *Keon H.*, 2018-NMSC-033, ¶ 41 (alteration, internal quotation marks, and citation omitted). "Efforts to assist a parent may include individual, group, and family counseling, substance abuse treatment, mental health services, transportation, child care, and other therapeutic services." *Id.* (internal quotation marks and citation omitted).

**{24}** Mother contends that CYFD did not advise her that she must separate from Father in order to be reunited with Child.[3] Specifically, Mother maintains that she "consistently expressed her willingness to participate in treatment," but that CYFD's treatment of Parents was detrimental to her reunification with Child because Mother and Father were treated only as a couple and referred to couple's counseling. Finally, Mother asserts that because of CYFD's failure to direct Mother to separate from Father, it is impossible to know if "Mother could ameliorate" the conditions and causes of Child's neglect in the foreseeable future. We reject each of Mother's arguments.

**{25}** Mother relies heavily on *Joseph M.*, in which this Court reversed the termination of a father's parental rights. *See* 2006-NMCA-029, ¶ 2. For purposes of clarity in our analysis, we offer a summary of that case. In *Joseph M.*, CYFD alleged, among other things, that the children were in an environment of domestic violence. *Id.* ¶ 3. CYFD never definitively made the father aware that his inability to create distance between himself and his children's mother may serve as grounds for terminating his parental rights since his relationship with his children's mother constituted an inability to give his children appropriate care. *Id.* ¶¶ 20, 22-23. There, this Court stated that "[w]hen a parent is in an abusive relationship and the abuser is obviously and physically harming the children, parental rights can be terminated of the parent who is doing nothing to prevent the abuse." *Id.* ¶ 20. However, this Court recognized a distinction between those cases of clear abuse and cases of abuse "when the behavior of the parent's partner is more subtle, such that it is difficult for a person of ordinary intelligence and sensibilities to realize that the partner's self-centeredness or other characteristic is harming the children[.]" *Id.* In instances of the latter, rather than assuming that the non-abusive parent undoubtedly appreciates the harm such abuse is causing their children, this Court recognized a heightened requirement for CYFD to demonstrate that it made reasonable efforts, such as formulating or implementing a treatment plan for the non-abusive parent to separate from the abusive parent and raise the children alone. *See id.* ¶¶ 20, 22-23. We conclude that the case before us is distinguishable.

**{26}** Mother's progress here stands in contrast to that of the father in *Joseph M.*, who made constructive advancements in his case plan and was hindered primarily by his

---

[3]Mother repeatedly states that CYFD never advised her that separation from Father may be necessary for reunification with Child, therefore she was not aware that remaining in a relationship with Father hindered her ability to reunify with Child. We briefly note here that while the evidence adduced at trial did not definitively show that CYFD advised Mother that separation from Father may be necessary for reunification with Child, there is ample evidence of such notice in the record. While these warnings play no role in our analysis and disposition here, our review of the record, as set out more fully in our factual background, reveals no less than six separate warnings to Parents that their relationship status could interfere with reunification. These warnings came from Child's guardian ad litem, Mother's attorney, and the district court.

relationship with his children's mother. *See id.* ¶¶ 11, 23. Indeed, contrary to her assertions regarding her engagement in treatment, Mother continually failed to participate in the services required of her by the case plan while she was still in a relationship with Father and, at one point, stated that she no longer intended to continue work on the case plan. Additionally, the record does not lend support to Mother's position that CYFD treated Parents only as a couple. To the contrary, testimony at trial established that CYFD made efforts to understand Parents' relationship status and responded accordingly. Moreover, one of the findings judicially-noticed by the district court at trial indicates that Mother began individual counseling sessions, yet failed to continue them. And, while it is true that Parents attended couple's therapy, after Parents informed CYFD of their separation, CYFD took steps to aid Mother in enrolling in individual services, and Mother failed to participate. Finally, to the extent that Mother argues that "CYFD should have made individual counseling the focus of Mother's treatment plan from the outset," we remind Mother that CYFD need only make *reasonable* efforts, not perfect efforts. *See Keon H.*, 2018-NMSC-033, ¶ 43.

**{27}** To the extent Mother alleges that CYFD failed to make reasonable efforts at reunification because Child's psychotherapist was not in contact with her, we note that Child's psychotherapist testified that this dialogue was clinically unnecessary. Additionally, the clinical psychologist who provided services to both Parents and Child testified that Parents could not fully participate in Child's therapy due to their inability to concede the reasons they lost custody of Child. Indeed, the evidence at trial showed a continual failure of Mother to acknowledge and appreciate the impact of domestic violence on Child and the role she played in the domestic violence, and a lack of follow-through after completing her assessment with the clinical psychologist. Again, this is quite different from the facts and analysis in *Joseph M*. There, while the father did not fully understand the gravity of his children witnessing domestic violence, he did recognize that his children were witnesses to this activity. *Id.* ¶ 13. Here, Mother's actions in this regard amounted to little more than denials that domestic violence was an issue between Parents. *See Keon H.*, 2018-NMSC-033, ¶ 48 (noting that the burden of making efforts to reunify families is not borne by CYFD alone, but is also shouldered by parents).

**{28}** As to Mother's contention that there was no way of knowing whether she could ameliorate the conditions and causes of Child's neglect had CYFD done more to address the domestic abuse, we note that while Mother was still in a relationship with Father, Parents explicitly stated that they no longer wished to continue work on the case plan. Upon Parents' separation, Mother failed to maintain contact with CYFD and to participate in individual therapy. We agree with Mother's assessment that her "problems with domestic violence continued." However, we reject Mother's assertion that things *may* have been different if CYFD had provided her with different services.

**{29}** First, we note again that CYFD's efforts need not be perfect and that the parent shares in the responsibility of making efforts at reunification. *Id.* ¶¶ 43, 48. Here, CYFD took steps to ensure that Mother was enrolled in individual services following her separation from Father, but Mother chose not to participate in those services. Secondly,

nearly three years passed from the date that Child was taken into CYFD custody to the date that the TPR trial began. We remain cognizant that "the [district] court is not required to place the children indefinitely in a legal holding pattern, when doing so would be detrimental to the children's best interests." *State ex rel. Human Servs. Dep't v. Dennis S.*, 1989-NMCA-032, ¶ 7, 108 N.M. 486, 775 P.2d 252; *see also State ex rel. Children, Youth & Families Dep't v. Nathan H.*, 2016-NMCA-043, ¶ 41, 370 P.3d 782 (stating that "[p]arents do not have an unlimited time to rehabilitate and reunite with their children" (internal quotation marks and citation omitted)). This lapse is particularly significant in this case, where expert testimony adduced at trial indicated that Child needed permanency "as quickly as possible."

{30}    Insofar as Mother premises her argument regarding the amelioration of the conditions and causes of Child's neglect on the issue of substance abuse, we note that the judgment terminating Parents' parental rights does not indicate that the district court relied on Mother's substance abuse as a basis for termination. Thus, the matter of Mother's substance abuse has no bearing on the decisive issue—whether the actual conditions and causes of Child's neglect were likely to change. Accordingly, we engage in no further analysis in this regard.

{31}    We are therefore satisfied that clear and convincing evidence demonstrated that CYFD engaged in reasonable efforts to reunify Mother and Child and that the conditions and causes of Child's neglect were unlikely to change in the foreseeable future. *See State ex rel. Children, Youth & Families Dep't v. Patricia H.*, 2002-NMCA-061, ¶ 28, 132 N.M. 299, 47 P.3d 859 ("[O]ur job is not to determine whether CYFD did everything possible; our task is limited by our statutory scope of review to whether CYFD complied with the minimum required under law."). For all these reasons, we reject Mother's arguments.

## CONCLUSION

{32}    In light of the foregoing, we affirm the termination of Mother's parental rights to Child.

{33}    **IT IS SO ORDERED.**

**SHAMMARA H. HENDERSON, Judge**

**WE CONCUR:**

**JENNIFER L. ATTREP, Judge**

**JANE B. YOHALEM, Judge**