## STATE EX REL. CYFD V. NICOLE C.

This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

**STATE OF NEW MEXICO ex rel. CHILDREN, YOUTH & FAMILIES DEPARTMENT,**
**Petitioner-Appellee,**
**v.**
**NICOLE C.,**
**Respondent-Appellant**
**and**
**MARTY Y. and CHASE A.,**
**Respondents,**
**IN THE MATTER OF DEVIN Y., MARTY Y., and CORLYNN Y.,**
**Children.**

Docket No. A-1-CA-37327
COURT OF APPEALS OF NEW MEXICO
April 25, 2019

APPEAL FROM THE DISTRICT COURT OF LEA COUNTY, Lee A. Kirksey, District Judge

### COUNSEL

Children, Youth & Families Department, Rebecca J. Liggett, Chief Children's Court Attorney, Santa Fe, NM, Kelly P. O'Neill, Children's Court Attorney, Albuquerque, NM for Appellee

Law Offices of Nancy L. Simmons, P.C., Nancy L. Simmons, Albuquerque, NM for Appellant

Laura K. Castillo, Hobbs, NM, Guardian Ad Litem

### JUDGES

J. MILES HANISEE, Judge. WE CONCUR: MEGAN P. DUFFY, Judge, ZACHARY A. IVES, Judge

**AUTHOR:** J. MILES HANISEE

### MEMORANDUM OPINION

**HANISEE, Judge.**

**{1}**    Nicole C. (Mother) appeals the district court's termination of her parental rights to Devin Y., Marty Y., and Corlynn Y. (collectively, Children). We reverse and remand for further proceedings.

**BACKGROUND**

**{2}**    In March 2016, the New Mexico Children, Youth and Families Department (CYFD) filed an abuse and neglect petition against Mother, Mother's live-in boyfriend Chase A. (Boyfriend), and Children's biological father Marty Y. (Father),[1] alleging that Children, ages twelve, eight, and six, had witnessed domestic violence and been exposed to drugs in the home. CYFD also sought an ex parte custody order, which the district court granted after finding probable cause to believe that Children had been exposed to drugs in the home, were present when Mother and Boyfriend were drinking, and witnessed domestic violence between Mother and Boyfriend. The specific incident that led to CYFD's custody petition was a fight between Mother and Boyfriend during which Mother punched Boyfriend in the face and Boyfriend, in response, commanded the couple's full-grown rottweiler dog to bite Mother. Mother and Boyfriend were both intoxicated at the time.

**{3}**    In May 2016, Mother and Boyfriend pleaded no contest to the charge of neglect, as defined by NMSA 1978, Section 32A-4-2(F)(2) (2016, amended 2018). The district court found that the causes and conditions of the neglect were "alcohol and domestic violence" and ordered CYFD to make reasonable efforts to implement a treatment plan[2] to assist Mother and Boyfriend in adjusting the causes and conditions that rendered them unable to properly care for Children.

**{4}**    The original treatment plan, developed by CYFD and adopted by the district court in May 2016, required that Mother: (1) participate in a psychological examination and follow any resulting recommendations; (2) participate in alcohol and drug abuse assessment and follow any recommendations; (3) attend all scheduled visits with Children; (4) participate in random urinalysis and hair follicle testing; (5) find and maintain clean, safe housing; (6) attend Alcoholics Anonymous (AA)/Narcotics Anonymous meetings two to three times per week; (7) maintain weekly contact with Christina Johnston, the permanency planning worker assigned to the case; and (8)

---

[1]Father lives in the state of Washington and has not appealed the termination of his parental rights. This opinion discusses Father no further.

2In the 2016 amendments to the Abuse and Neglect Act (the Act), NMSA 1978, §§ 32A-4-1 to -35 (1993, as amended through 2018), some, but not all, instances of the use of the term "treatment plan" were replaced with the term "case plan." Compare § 32A-4-22(C) (2009) (providing that the court shall "order the department to implement and the child's parent . . . to cooperate with any treatment plan approved by the court" (emphasis added)), with § 32A-4-22(C) (2016) (providing that the court shall "order the department to implement and the child's parent . . . to cooperate with any case plan approved by the court" (emphasis added)). The record in this case primarily uses the term "treatment plan," which is what this opinion will use except where referring to statutory sections where the term "case plan" is used instead.

obtain and maintain employment and other assistance and provide Ms. Johnston with proof of employment and a monthly budget. The treatment plan required the same of Boyfriend with the additional requirement that Boyfriend participate in a domestic violence counseling program in order to achieve the "desired outcome" of "creating relationships free of violence[.]" Domestic violence counseling was *not* contained in Mother's treatment plan, though the record indicates that Mother completed domestic violence counseling through Options, Inc., in April 2016.

{5}     CYFD's June 2016 report to the district court indicated that Mother and Boyfriend had made minimal progress on their respective portions of the treatment plan during the first month, but recognized that Mother and Boyfriend "love [C]hildren and are working toward the common goal of reunification." CYFD noted that by then Mother had "successfully completed [d]omestic [v]iolence [c]ounseling" and that Boyfriend had "completed three of his counseling sessions." Yet CYFD also reported that it had received information regarding additional, recent "domestic violence altercations" that occurred in April and May 2016, after Mother and Boyfriend had begun counseling but before the treatment plan was adopted. In CYFD's report for the initial judicial review hearing, it assessed the reasons why Mother and Boyfriend had not made more progress toward the desired outcomes identified in the treatment plan as follows:

> [Mother] and [Boyfriend] can work well as a team. They offer support and understanding to each other when they are sober. Both incidents of domestic violence occurred while [Mother] and [Boyfriend] were intoxicated. Their progress in this case is hindered by their substance/alcohol use and domestic violence towards each other.

Despite that observation, CYFD never explicitly prohibited Mother from consuming alcohol. CYFD noted that in a meeting with Mother regarding the two newer domestic violence incidents, it had "suggested that [Mother] and [Boyfriend] seek individual and couples counseling to work through their issues" related to ongoing domestic violence. In its June 2016 initial judicial review order, the district court noted that it was modifying CYFD's proposed treatment plan to reflect that suggestion by adding that Mother and Boyfriend "will be referred for couples counseling at Guidance Center" in order to "deal with domestic violence."

{6}     Despite the district court's directive, there is no evidence that CYFD referred Mother and Boyfriend to Guidance Center for couples counseling at that time. The treatment plans provided to the district court in September and November 2016 did not contain requirements for Mother and Boyfriend to attend couples counseling or for Mother to attend individual counseling. It was not until January 2017 that the treatment plan was updated to reflect additional counseling requirements for Mother and Boyfriend. At that time, CYFD indicated it was going to refer Boyfriend to "anger management counseling[,]" Mother to "individual counseling to address drug use, domestic violence, and the need for a partner[,]" and both Mother and Boyfriend to couples counseling to "[d]iscuss the impact of [Mother's and Boyfriend's] choices on [C]hildren" and "address domestic violence issues." Ms. Johnston testified at the

January 2017 hearing that those changes to the treatment plan were being made pursuant to the recommendations of the psychologist who conducted Boyfriend's and Mother's psychological evaluations, which were completed in October and November 2016, respectively. Ms. Johnston also informed the court that Mother "has done everything that we've asked so far[,]" including maintaining employment, attending visitations with Children, saving money for a home, and having clean drug tests. Regarding Mother's progress toward developing the skills to eliminate the conditions that brought Children into custody, Ms. Johnston pointed to Mother's completion of domestic violence counseling and her negative drug test as positive indicators and explained that she believed that "with the individual counseling and couples counseling, that should fully resolve those issues." When asked whether there were any areas in which Mother needed to make further progress, Ms. Johnston responded, "Yes, she needs to get a home, and she needs to finish the individual counseling and the couples counseling."

{7}     Turning to Boyfriend's compliance with the plan, Ms. Johnston reported that Boyfriend was looking for but had not yet obtained employment, that his most recent drug test was negative, that he had completed his psychological evaluation, and that he had "just recently" completed domestic violence counseling. Ms. Johnston stated that Boyfriend "does still have a little work to do," specifically, complete anger management classes and participate in couples counseling in accordance with the recommendation from his psychological evaluation. Regarding the issue of alcohol, Ms. Johnston noted that she was requiring that Boyfriend submit to random urinalysis testing but that she was not going to require Boyfriend to attend AA at that time because she wanted "to see if the alcohol is an issue first" and, if so, "the extent of" Boyfriend's issues with alcohol before adding such a requirement to his plan. Ms. Johnston said it would become evident within a few tests over the next couple of weeks whether Boyfriend needed additional services to address any issues with alcohol. As to Boyfriend's progress under the plan, Ms. Johnston noted that Boyfriend's drug tests were negative, that he continued to visit with Children, and that there had been no reported incidents of domestic violence with Mother. Ms. Johnston testified that Boyfriend still needed to attend anger management classes, obtain employment, find a home for the family, attend couples counseling, and have negative alcohol urinalyses.

{8}     As of January 2017, CYFD's recommendation, adopted by the district court, was to continue with efforts toward reunification of the family and begin a transition-home plan as soon as Mother and Boyfriend obtained suitable housing and had one more negative drug test. The district court's initial permanency order in January 2017 found that Mother "has made substantial progress toward eliminating the problem that caused [Children's] placement in foster care" and that "it is likely that [C]hildren will be able to safely return to [Mother's] home [in] a reasonable amount of time."

{9}     However, at the March 14, 2017, permanency review hearing, Ms. Johnston informed the court that there had been another recent incident of domestic violence between Mother and Boyfriend just two days earlier, on March 12. That incident involved Boyfriend "trying to break down a door at their home and get to Mother" while

Devin was visiting with Mother. No charges were filed, and there was no evidence that a physical altercation in fact occurred. Even after that incident, CYFD continued to recommend a plan of reunification at the March 14 hearing, noting that it was planning to internally review the case the following week. Despite CYFD's recommendation, the district court issued a permanency review order following the March 14 hearing that changed the permanency plan from reunification to adoption based on its finding that "[t]he issues that brought [C]hildren into foster care (domestic violence and substance abuse) are recurring and a change of plan is appropriate given that [C]hildren have been foster care for [twelve] months and the transition home cannot be begun due to this weekend's domestic violence incident." The district court's permanency review order provided that Mother and Boyfriend both "need[] to make further progress" by participating in couples counseling.

**{10}**   CYFD's April 2017 status conference report to the district court explained:

> [Mother] is trying very hard to find counseling for her and [Boyfriend]. She has followed up on recommendations to Guidance Center, Zia [Consulting,] and Crosswinds church. [CYFD] continues to assist [Mother] on finding alternative[] places to attend counseling that will work with [Mother's] and [Boyfriend's] schedules. [Mother] continues to attend [d]omestic [v]iolence counseling at Options. [Mother's] last hair follicle test was negative for all substances. [Mother] continues to have visitation with [C]hildren and would like to be reunited with them.

CYFD reported that Boyfriend had obtained employment and works "at least [twelve] hours per day" and that he "has difficulty attending counseling and AA due to his work schedule." In its April 2017 status conference order, the district court found that Mother had made "good efforts" and Boyfriend had made "small efforts" to participate in and make progress under the treatment plan.

**{11}**   CYFD's June 2017 report to the district court indicated that Mother and Boyfriend "had another incident of [d]omestic [v]iolence" earlier that month. According to the report, CYFD learned of the incident from Boyfriend's mother, who reported "that the police were called and [Boyfriend] was asked to leave the home for [seventy-two] hours." CYFD's report noted that "no [police] incident report was made in connection to th[e] incident." As a result, CYFD noted its concern that "[Mother] and [Boyfriend] have not alleviated alcohol use and domestic violence from their lives. They have attended [d]omestic [v]iolence programs that are designed to assist participants in finding more appropriate ways to deal with anger. Yet, they can't put this information into action." Despite CYFD's concern, CYFD did not change, and the district court did not order modification of, the treatment plan at that time.

**{12}**   At the termination of parental rights (TPR) hearing in September 2017, Ms. Johnston noted that Mother and Boyfriend "separated very briefly" after the March 2017 incident but that Mother then "return[ed] to [Boyfriend]." She also acknowledged that Mother suggested at one point that "she was willing to leave [Boyfriend] to rectify the

situation," but Ms. Johnston "didn't think [Mother] was really serious about that" because she saw Mother back with Boyfriend two days later. Ms. Johnston then stated, for the first time, that it was her opinion that Boyfriend was "a large factor" in why Children could not safely be returned home. When specifically asked if she would have a different opinion regarding the safety of Children if Boyfriend was no longer in the house, Ms. Johnston replied, "Yes, I would." Despite that belief, Ms. Johnston conceded that she had never communicated to Mother that if Mother stayed with Boyfriend, the consequence would be the loss of her parental rights.

{13}    At the conclusion of the TPR hearing, the district court terminated Mother's parental rights. Nearly five-and-a-half months later, the district court issued its judgment terminating parental rights and found, inter alia, that "Mother had multiple discussions with [Ms. Johnston in which Mother was informed] that the ongoing domestic violence between her and [B]oyfriend w[as] preventing [C]hildren from coming home[,]" and concluding that the conditions and causes of Children's neglect by Mother were "unlikely to change in the foreseeable future despite reasonable efforts by CYFD to assist [Mother] in adjusting the conditions which render Mother . . . unable to care for . . . Children properly." Mother appeals, challenging this particular finding and conclusion and all others that supported the district court's termination of her parental rights.

## DISCUSSION

{14}    Mother argues that there was not clear and convincing evidence to support termination of Mother's parental rights. Specifically, Mother challenges the sufficiency of the evidence supporting the district court's conclusions that (1) CYFD made reasonable efforts to assist Mother with addressing the conditions and causes of neglect in order to support reunification, and (2) Mother had not ameliorated the conditions and causes of neglect and would not do so in the foreseeable future.

## I.    Standard of Review

{15}    When a party challenges the sufficiency of the evidence supporting the district court's decision to terminate parental rights, we ask "whether the [district] court's conclusion, when viewed in the light most favorable to the decision below, was supported by substantial evidence[.]" *State ex rel. Children, Youth & Families Dep't v. Patricia H.*, 2002-NMCA-061, ¶ 31, 132 N.M. 299, 47 P.3d 859. "Substantial evidence is such relevant evidence that a reasonable mind would find adequate to support a conclusion." *Landavazo v. Sanchez*, 1990-NMSC-114, ¶ 7, 111 N.M. 137, 802 P.2d 1283. "The grounds for any attempted termination [of parental rights] shall be proved by clear and convincing evidence." Section 32A-4-29(I). "To meet the clear and convincing evidence standard, the evidence must instantly tilt the scales in the affirmative when weighed against the evidence in opposition and the fact finder's mind is left with an abiding conviction that the evidence is true." *State ex rel. Children, Youth & Families Dep't v. Alfonso M.-E.*, 2016-NMCA-021, ¶ 26, 366 P.3d 282 (internal quotation marks and citation omitted). "We will uphold the district court's judgment if, viewing the evidence in the light most favorable to the judgment, a fact finder could properly

determine that the clear and convincing standard was met." *State ex rel. Children, Youth & Families Dep't v. Hector C.*, 2008-NMCA-079, ¶ 11, 144 N.M. 222, 185 P.3d 1072 (internal quotation marks and citation omitted).

## II. What CYFD Must Prove in Order to Terminate Parental Rights Based on Alleged Neglect

**{16}** In cases where CYFD seeks to terminate parental rights under Section 32A-4-28(B)(2), CYFD is required to prove: (1) that it made reasonable efforts to assist the parent; and (2) that despite CYFD's reasonable efforts to assist the parent, the causes and conditions of the neglect were unlikely to change in the foreseeable future. *See id.* (providing that the district court shall terminate parental rights when a child has been neglected upon a finding by the court "that the conditions and causes of the neglect . . . are unlikely to change in the foreseeable future despite reasonable efforts by [CYFD] to assist the parent in adjusting the conditions that render the parent unable to properly care for the child"); *State ex rel. Children, Youth & Families Dep't v. Joseph M.*, 2006-NMCA-029, ¶¶ 17-18, 139 N.M. 137, 130 P.3d 198 (agreeing that the termination of the father's parental rights was not supported by sufficient evidence where CYFD did not meet its requirement to prove these two elements). "The statutory prerequisite of reasonable efforts to assist the parent must be satisfied before parental rights may be terminated." *Patricia H.*, 2002-NMCA-061, ¶ 21. Where CYFD fails to meet its burden to prove by clear and convincing evidence that it made reasonable efforts, termination is improper. *See Joseph M.*, 2006-NMCA-029, ¶¶ 22-23 (reversing the district court's termination of the father's parental rights where this Court concluded that there was not clear and convincing evidence that CYFD had made reasonable efforts to assist the father and, therefore, that the district court could not have found that the causes and conditions were unlikely to change in the foreseeable future); *see also* § 32A-4-28(B)(2) (requiring the district court to find, prior to termination of parental rights, "that the conditions and causes of neglect . . . are unlikely to change in the foreseeable future despite reasonable efforts by [CYFD]").

**{17}** There is no set formula for determining whether CYFD has made reasonable efforts to assist the parent. *See State ex rel. Children, Youth & Families Dep't v. Keon H.*, 2018-NMSC-033, ¶ 41, 421 P.3d 814 (explaining that "Section 32A-4-28(B)(2) does not enumerate the specific methods of assistance that are sufficient to constitute reasonable efforts, beyond stating that the efforts should be directed to assist the parent in remedying the conditions and causes of neglect"). Whether CYFD "has made reasonable efforts varies with a number of factors, such as the level of cooperation demonstrated by the parent and the recalcitrance of the problems that render the parent unable to provide adequate parenting." *Joseph M.*, 2006-NMCA-029, ¶ 20 (alteration, internal quotation marks, and citation omitted). Ultimately, we consider "the totality of the circumstances when reviewing the district court's determination" that reasonable efforts were made. *Keon H.*, 2018-NMSC-033, ¶ 41.

## III. Whether CYFD's Efforts to Assist Mother Were Reasonable

**{18}**    Here, the only finding that the district court made related to the issue of whether CYFD make reasonable efforts to assist Mother was that "Mother had multiple discussions with [Ms. Johnston] that the ongoing domestic violence between her and [B]oyfriend were preventing . . . Children from coming home." The district court made no other findings regarding what efforts CYFD made to assist Mother but merely concluded that "CYFD made reasonable efforts to assist Mother." As noted above, Mother challenges the foregoing finding regarding the discussions Mother and Ms. Johnston had, as well as the district court's "reasonable efforts" conclusion, as being unsupported by substantial evidence. CYFD contends that "using a totality of the circumstances analysis . . . , it is clear that [CYFD's] efforts were reasonable." According to CYFD, the following comprised its efforts to assist Mother:

> [CYFD] referred Mother for Family Reunification Court, hair follicle tests, and participation in AA. [CYFD] monitored Mother's participation in domestic violence prevention classes that were court-ordered . . . . [CYFD] facilitated Mother's participat[ion] in visits . . . in the familial home when [CYFD] was attempting to transition Children back to residing in Mother's home. [CYFD] also attempted to make efforts to assist [Boyfriend] in addressing his issues. Ms. Johnston searched extensively for resources that would help facilitate the participation of Mother and [Boyfriend] in couples counseling. Unfortunately, Ms. Johnston ran in to insurmountable financial barriers.

Mother does not challenge CYFD's description of its efforts but argues that those efforts cannot be considered reasonable under the circumstances because they were not directed at the causes and conditions that gave rise to the neglect. *See State ex rel. Children, Youth & Families Dep't v. Athena H.*, 2006-NMCA-113, ¶ 9, 140 N.M. 390, 142 P.3d 978 (explaining that the purpose of the treatment plan is to "provide the framework for the efforts of CYFD and the parent"); *State ex rel. Human Servs. Dep't v. Penny J.*, 1994-NMCA-143, ¶ 20, 119 N.M. 328, 890 P.2d 389 ("A parent may . . . impeach the reasonableness of efforts to enable him or her to correct the underlying causes and conditions on the basis that those efforts were directed at the wrong causes and conditions or were insufficient because of unique factors."). Regarding the issue of domestic violence, specifically, Mother contends that the general "framework" that CYFD adopted, as reflected in the treatment plan's requirements, "made it nearly impossible for Mother to overcome the barriers to reunification." Namely, Mother challenges the reasonableness of CYFD's treatment of Mother and Boyfriend as a unit throughout the proceedings, its requirement that Mother participate in couples counseling with Boyfriend, and its failure to even suggest, let alone make explicit, that Mother's ability to reunite with Children depended on her separation from Boyfriend, particularly once CYFD came to the conclusion—very shortly before termination—that Boyfriend was an impediment to Mother's reunification with Children. *See* § 32A-4-21(B)(10) (providing that the "case plan" must "set[] forth services to be provided to the child and the child's parents to facilitate permanent placement of the child in the parent's home"); § 32A-4-28(B)(2) (providing that CYFD's efforts must be directed towards "adjusting the conditions that render the parent unable to properly care for the

child"). Mother principally relies on *Joseph M.* in arguing that this final failure rendered unreasonable CYFD's efforts, thereby making termination improper.

**{19}**　In *Joseph M.,* the abuse and neglect petition alleged that the parents "had substance abuse problems and that their children had witnessed domestic violence in the home, as well as allegations of a cigarette burn, [the f]ather's threat to beat a child, and [the m]other's endangering a child by holding onto him during an episode of domestic violence." 2006-NMCA-029, ¶ 3. CYFD's goal throughout was "reunification of the children with both parents[,]" and the treatment plan developed for the parents "treated [them] as a unit[.]" *Id.* ¶ 19. While the mother "failed to make progress towards becoming an adequate parent[,]" the father "did make some progress[,]" including successfully dealing with his substance abuse problems and "demonstrat[ing] an interest in learning how to become a better parent." *Id.* ¶¶ 10, 11, 12. However, the father "was determined to make things work with [the m]other because she needed help and he did not want to abandon her[.]" *Id.* ¶ 19. In the end, both parents' parental rights were terminated. *Id.* ¶ 14.

**{20}**　On appeal, the father argued that there was insufficient evidence to support the district court's conclusions that CYFD had made reasonable efforts to assist him and that the conditions and causes of neglect were unlikely to change in the foreseeable future. *See id.* ¶¶ 17-18. CYFD defended the termination by arguing that "the most dangerous condition that [the f]ather was unable or unwilling to remedy is the presence of [the m]other in the home." *Id.* ¶ 19 (internal quotation marks omitted). We rejected CYFD's arguments, noting that "the option of raising the children without [the m]other was never included as a goal in any of the treatment plans adopted by [CYFD] or ordered by the court for [the f]ather." *Id.* In reversing the termination of the father's parental rights, we explained that "[w]hen a parent is in an abusive relationship and the abuser is obviously and physically harming the children, parental rights can be terminated of the parent who is doing nothing to prevent the abuse." *Id.* ¶ 20. However, we went on to caution that "when the behavior of the parent's partner is more subtle, such that it is difficult for a person of ordinary intelligence and sensibilities to realize that the partner's self-centeredness or other characteristic is harming the children, *we believe that more is required of CYFD than simply expecting the parent to know and appreciate the harm being caused.*" *Id.* (emphasis added). Under the circumstances of that case, which included agreement by the social workers that the father "was motivated to comply" with CYFD and had "made some steps to improve his parenting skills," and where the father's failure to appreciate that the problem was "mainly with" the mother was "understandable," we concluded that "it was incumbent on [CYFD] to have a specific treatment plan or specifically alert [the f]ather to the consequences of his staying with [the m]other." *Id.* ¶ 23. After noting that "there was no evidence of any specific discussion with [the f]ather indicating that he would have to leave [the m]other to become a successful parent and no part of the treatment plan listed this factor as an element[,]" we concluded that the district court could not have properly found by clear and convincing evidence that CYFD made reasonable efforts to assist the father with adjusting the conditions and causes of the neglect. *Id.* ¶ 22.

**{21}** This case is substantially similar to *Joseph M.* Here, Mother and Boyfriend were treated as a unit throughout the proceedings, even after it became clear to Ms. Johnston that Mother was making progress under the treatment plan and Boyfriend was not. Ms. Johnston testified that it was after the March 2017 incident and no later than June 2017 that she "started thinking that [Boyfriend] was the problem in the household." However, like in *Joseph M.*, Mother's treatment plan never included a recommendation or requirement that Mother separate from Boyfriend, much less any reasonable effort to facilitate or assist Mother with separation.[3] Indeed, the treatment plan continued to require Mother to attend couples counseling with Boyfriend, even after the new domestic violence incidents occurred in March and June 2017 where *Boyfriend* was the aggressor, i.e., after it became clear to CYFD that Boyfriend was the impediment to Mother's reunification with Children.

**{22}** Moreover, like the father in *Joseph M.*, it was undisputed that Mother had made substantial progress under the plan, including obtaining and maintaining a job, saving money and securing a proper home, ending her drug use, and complying with all counseling required of her and over which she had control. Mother visited with Children regularly, missing scheduled visits only "due to work and finding a home[,]" and was described as being "affectionate with [C]hildren and concerned about their well-being." Indeed, Ms. Johnston "was very proud of the progress that [Mother] was making" prior to March 2017 when the "domestic violence started up again." Ms. Johnston noted that Mother only began to express "frustrat[ion]" with the process in June 2017 and that Mother's frustration was over the fact that "she was unable to find counseling" and "didn't know what more she needed to do." Indeed, CYFD had not told Mother what more she needed to do other than attend couples counseling with Boyfriend despite that the pair had tried, unsuccessfully, for months to find a counselor who could accommodate their work schedules.

**{23}** Finally, the record before us establishes that, as in *Joseph M.*, the "recalcitrance" of the problem that brought Children into custody was attributable not to the parent making progress, here, Mother, but to that parent's partner. Notably, when the district court changed the plan from reunification to adoption in March 2017—a change that was not requested by CYFD—the immediately precipitating domestic violence incident that singly served as the basis for the change of plan was one over which Mother had little, if any, control. We find it troubling that the district court premised the change of plan to adoption—which set the course for terminating Mother's parental rights, on Boyfriend's unilateral act of "trying to break down a door" to "get to Mother[.]"[4] *See State ex rel. Children, Youth & Families Dep't v. Maria C.*, 2004-NMCA-083, ¶ 30, 136 N.M. 53, 94 P.3d 796 (explaining that once the permanency plan is changed to adoption, "the course is set for termination, even though reunification is still theoretically possible").

---

[3]Notably, Ms. Johnston testified that she was not sure if Mother could support herself and Children on her salary alone and conceded that she and Mother "never worked out a budget on whether [Mother] could do it on her own or not" and also that she never required that Mother "work[] out a budget."

[4]At the March 14, 2017 hearing, Ms. Johnston testified that she had received a call from Boyfriend's mother, reporting that there was "an incident" involving "a physical altercation" between Boyfriend and Mother on March 11, 2017; however, Ms. Johnston stated that she "wasn't able to confirm that."

According to the district court, that incident suggested that the parties were "falling back into old patterns." However, the "old pattern" was one in which Mother and Boyfriend would *both* consume alcohol and/or illicit drugs, after which they would *mutually* engage in domestic violence. Critically, the record contains no evidence that Mother engaged in domestic violence on March 12 or that drug or alcohol use by Mother was a factor at the time of the incident.[5] Instead, the record establishes that Mother was engaged in an unsupervised visit with Devin as part of the transition-home plan that CYFD had put in place in anticipation of reunification and that Mother proactively called Ms. Johnston to enlist her assistance with the situation. Thus, while legitimate concerns regarding domestic violence continued to exist at the March 2017 hearing, all indications were that Boyfriend, not Mother, was the current source of the problem.

**{24}** Under the totality of the circumstances, we believe, as in *Joseph M.*, that CYFD was under an obligation to do more than simply expect Mother to know that Boyfriend's choices were causing harm and that she had to separate from him to be reunified with Children. Mother's psychological evaluation expressly informed CYFD that Mother "is a concrete think[er] and may have difficulty with the nuances of situations[,]" and the evaluation specifically recommended that CYFD "ensure that all aspects of the treatment plan are discussed and that each criterion is thoroughly explained, along with [the] consequences of not following projects to completion." Despite this recommendation, the record indicates that CYFD gave Mother at best vague direction regarding what she must do to satisfy CYFD and the court that it was safe to return Children to Mother.[6] And it is undisputed that CYFD never told Mother that CYFD's perspective had become that Boyfriend's failure to comply with his requirement to "create relationships free of violence" was a condition and cause of Children's neglect, and that to be reunited with Children, Mother had to "adjust" by separating from Boyfriend. *See* § 32A-4-28(B)(2).

**{25}** The record shows: (1) Mother desired reunification, (2) Mother was consistently committed to complying with and making progress under the treatment plan, (3) the "recalcitrance of the problems" stemmed from Boyfriend, not Mother, and (4) CYFD failed to notify Mother that her failure to separate from Boyfriend could constitute a basis for terminating her parental rights. Based on these facts, we conclude that the district court could not have found by clear and convincing evidence that CYFD met its statutory obligation to make reasonable efforts to assist Mother.

---

[5] Ms. Johnston testified that Mother told her that she and Boyfriend "had gone out the night before and had a few drinks" but that Ms. Johnston did not "know how much it was." Ms. Johnston also verified that Mother's most recent drug test had come back negative.

[6] For example, asked if she believed Mother "was aware that the choice to stay with [Boyfriend] was in essence an assumption of risk that she would lose . . . Children," Ms. Johnston replied, "We did discuss what was going on with the family, we discussed the importance of the couples' counseling—why it was needed, what it was to address. I never specifically told her that she needed to leave [Boyfriend], but we did discuss . . . what was going on in the family and why . . . Children could not go home." And asked whether she ever told Mother that if she stayed with Boyfriend, she would lose her parental rights, Ms. Johnston replied, "Not specifically, no. We just discussed what was going on in the home and how that was affecting . . . Children being returned to her."

**CONCLUSION**

**{26}**   We have no doubt that exposing children to parental substance abuse and domestic violence in the home can have traumatic, long-lasting consequences.[7] Following the March 2016 incident, CYFD acted within its authority by removing Children from a home where they were exposed to both domestic violence and drug use. However, when CYFD took custody of Children, CYFD was legally obligated to develop a treatment plan and make reasonable efforts to implement it with the goal of reunifying Mother and Children. The record does not include substantial evidence to support the district court's conclusion that CYFD met its statutory obligation. Accordingly, we also conclude that the district court also could not have properly determined that CYFD had proven by clear and convincing evidence that it was unlikely that the conditions and causes of the neglect would be changed in the foreseeable future. *See Joseph M.*, 2006-NMCA-029, ¶ 23 (reaching this conclusion because the record did not support the district court's "reasonable efforts" finding).

**{27}**   We reverse the district court's termination of Mother's parental rights and remand for further proceedings.

**{28}   IT IS SO ORDERED.**

**J. MILES HANISEE, Judge**

**WE CONCUR:**

**MEGAN P. DUFFY, Judge**

**ZACHARY A. IVES, Judge**

---

[7]See Yael Cannon & Dr. Andrew Hsi, Disrupting the Path from Childhood Trauma to Juvenile Justice: An Upstream Health & Justice Approach, 43 Fordham Urb. L.J. 425, 426, 430, 448 (2016) (describing "parental substance abuse" and "witnessing domestic violence" as types of trauma or "adverse childhood experiences" (ACEs), and explaining that (1) "the more ACEs a person had experienced in childhood, the higher the likelihood that the person would suffer poor health and mental health outcomes, and even early death[,]" and (2) witnessing domestic violence has "been linked to delinquency involvement").