# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: **August 20, 2015**

**NO. 34,061**

**STATE OF NEW MEXICO, ex rel.,**
**CHILDREN, YOUTH & FAMILIES**
**DEPARTMENT.**

      Petitioner-Appellee,

v.

**CHRISTINA L.,**

      Respondent-Appellant,

and

**IN THE MATTER OF JUSTIN L.,**

      Child.

**APPEAL FROM THE DISTRICT COURT OF SANDOVAL COUNTY**
**John F. Davis, District Judge**

Children, Youth and Families Department
Charles E. Neelley, Chief Children's Court Attorney
Kelly P. O'Neill, Children's Court Attorney
Albuquerque, NM

for Appellee

Law Office of Gina M. Maestas
Gina M. Maestas
Albuquerque, NM

for Appellant

Sherrie Lee Trescott, Esq.
Rio Rancho, NM

Guardian Ad Litem

**OPINION**

**FRY, Judge.**

{1}      Mother appeals the district court's judgment of adjudication concluding that her child was neglected on the basis of Mother's inability to care for the child due to a mental disorder or incapacity. On appeal, Mother argues that the evidence was insufficient to support this conclusion because no evidence of a psychological or medical diagnosis of mental disorder or incapacity was presented. We conclude that the district court's findings do not support a determination that Child was neglected pursuant to NMSA 1978, § 32A-4-2(E)(4) (2009). Accordingly, we reverse.

**BACKGROUND**

{2}      This is Mother's second appeal of a judgment of adjudication concluding that Child is neglected. Child was initially taken into the Children, Youth, and Families Department's (CYFD) custody in 2009 based on allegations that domestic violence toward Mother was taking place in the home. In the first case, the district court found that Child was neglected and abused pursuant to Section 32A-4-2(B)(1), (4), and (E)(2) ("[A]bused child means a child . . . who has suffered or who is at risk of suffering serious harm because of the action or inaction of the child's parent, guardian or custodian . . . [or] whose parent, guardian or custodian has knowingly, intentionally or negligently placed the child in a situation that may endanger the

child's life or health. . . . [A] 'neglected child' means a child . . . who is without proper parental care and control or subsistence, education, medical or other care or control necessary for the child's well-being because of the faults or habits of the child's parent, guardian or custodian or the failure or refusal of the parent, guardian or custodian, when able to do so, to provide them[.]"). In Mother's appeal in the first case, this Court concluded that the district court abused its discretion in admitting 911 dispatch logs and that without these logs there was insufficient evidence to support the district court's conclusion that Child was abused or neglected. *State ex rel. Children, Youth & Families Dep't,* No. 31,151, mem. op. 2, 10 (N.M. Ct. App. Sept. 18, 2012) (non-precedential). We remanded the case to the district court to determine whether Mother should regain custody of Child. *Id.* at 12.

{3}     On remand, the district court adopted a permanency plan for reunification. Mother participated with CYFD in the reunification plan over the next several months; however, CYFD subsequently filed a motion for leave to file a supplemental abuse and neglect petition on the basis of Section 32A-4-2(E)(4) (stating that one basis of determining that a child is neglected is when the "parent, guardian or custodian is unable to discharge that person's responsibilities to and for the child because of incarceration, hospitalization or physical or mental disorder or incapacity"). In support of CYFD's allegation that Mother suffers from a mental

2

disorder or incapacity, CFYD stated that Mother had submitted to a "mind map assessment" by Dr. Craig Pierce, a psychologist. The petition alleged that the mind map determined Mother's mental capacity to be functionally equivalent to an eight-to ten-year-old child. CYFD moved to consolidate the two cases. Although the district court did not specifically rule on this motion, an adjudicatory hearing was scheduled to determine whether Child was neglected pursuant to the allegations in CYFD's supplemental petition.

{4} At the hearing, Dr. Pierce was qualified as an expert in child and family psychology. Dr. Pierce described the mind map as a non-diagnostic therapeutic tool to assess an individual's developmental history. Dr. Pierce described the process as "relatively simple" and includes gathering information regarding the individual's family history and adverse childhood events that may have impacted the individual's brain development. Dr. Pierce testified that the mind map relies on a nine-page questionnaire to gather this information. He further testified that the mind map uses this self-reported information to evaluate cognitive and relational brain development, as well as sensory integration and self-regulation, and compares the results in those categories to "age typical" results. Dr. Pierce testified that Mother's results showed her to be in the fortieth percentile for people her age. Dr. Pierce concluded that, based on the mind map, Mother's brain development in the areas covered by the mind map

3

were "significantly compromised" and that she functioned mentally at a lower age range to comparably aged adults. Dr. Pierce testified that, based on the results, Mother's ability to parent a small child was affected by her limitations, such as her ability to exercise sound judgment and prioritize the needs of Child. On cross-examination, however, Dr. Pierce clarified that the purpose of the mind map was to direct therapy and assist Mother in learning parenting skills, not to diagnose a mental disorder or condition or to act as a standardized test for determining an individual's intelligence, such as an IQ test.

{5}     Child's therapist, Brenda Lee, also testified at the hearing. Lee testified that while Mother showed aptitude in learning about Child's various mental diagnoses, Lee was frustrated by Mother's resistance to the "understanding training" Lee attempted to impart. Lee testified that Mother attempted to speak secretly to Child during supervised visits despite CYFD's instruction to Mother not to discuss Child's foster situation with Child. Lee testified that Mother's visits incited Child to exhibit reactive behaviors when he returned to his foster parents. Lee also testified that Mother threatened her on one occasion.

{6}     Testimony by CYFD representatives echoed Lee's testimony. One representative testified that, although Mother was eager to meet with CYFD representatives, she had difficulty accepting constructive feedback and focusing on

treatment goals. Mother also withdrew during meetings where she disagreed with discussions. Mother became resistant to further training by Lee after she was instructed on the results of the mind map.

{7} Sharon Blackwell, a CYFD representative, further testified regarding her concerns arising from a home assessment at Mother's residence. Blackwell noted that at the time of the visit, she observed that Mother had five dogs and a number of pet rats living at the residence. She testified that due to these animals, the home smelled of urine or feces. Blackwell also noted overflowing trash cans and general clutter throughout the home. Blackwell also expressed concern for the way in which Mother stored her medications and the presence of alcohol stored near Mother's bed.

{8} Mother also testified at the hearing. Pertinent to her testimony was the introduction of certificates showing Mother's successful completion of various parenting classes, including certificates awarded by Lee.

{9} Finally, although psychological evaluations of Mother were performed by Dr. Christopher Alexander and Dr. Nesha Morse, neither was called to testify. A CYFD representative was questioned regarding the findings of the psychological evaluations but could not recall the results. Reports of the evaluations were not otherwise introduced into evidence.

{10} At the conclusion of the hearing, the district court concluded that Child was

neglected pursuant to Section 32A-4-2(E)(4). In issuing its ruling, the district court made repeated statements to the effect that Mother was a "bright woman," "capable of learning and mastering information," and that she possessed an "intellectual ability that seems to hold promise." The district court concluded, however, that Mother's defiance toward CYFD evidenced an inability to safely parent Child. The district court equated Mother's defiance with a lack of judgment and with mental incapacity. The district court found that Mother was unwilling to accept training from CYFD for the benefit of Child but was instead insistent on vindictively acting out against CYFD. Accordingly, the district court concluded that the evidence was clear and convincing under Section 32A-4-2(E)(4) that Child was neglected. Mother appeals this determination.

**DISCUSSION**

**Standard of Review**

{11} "To meet the standard of proof in an abuse or neglect proceeding, the fact finder must be presented with clear and convincing evidence that the child was abused or neglected." *State ex rel. Children, Youth & Families Dep't v. Shawna C.*, 2005-NMCA-066, ¶ 7, 137 N.M. 687, 114 P.3d 367. "For evidence to be clear and convincing, it must instantly tilt the scales in the affirmative when weighed against the evidence in opposition and the fact finder's mind is left with an abiding

6

conviction that the evidence is true." *Id.* (internal quotation marks and citation omitted). "We employ a narrow standard of review and do not re-weigh the evidence." *State ex rel. Children, Youth & Families Dep't v. Amanda H.*, 2007-NMCA-029, ¶ 19, 141 N.M. 299, 154 P.3d 674. Instead, "we review to determine whether, viewing the evidence in the light most favorable to the prevailing party, the fact finder could properly determine that the clear and convincing evidence standard was met." *Id.*

{12}     To the extent Mother's arguments require interpretation of Section 32A-4-2(E)(4), we review such arguments de novo. *In re Mahdjid B.*, 2015-NMSC-003, ¶ 12, 342 P.3d 698 ("Statutory interpretation is a question of law, which we review de novo." (internal quotation marks and citation omitted)).

**Section 32A-4-2(E)(4)**

{13}     We begin with Mother's argument that there was insufficient evidence to support the district court's conclusion that Child was neglected under Section 32A-4-2(E)(4) because the district court made no findings supporting a conclusion that Mother suffers from a mental disorder or incapacity. Mother highlights statements made by the district court during its ruling indicating that Mother was mentally capable. Mother argues that the district court erred in equating Mother's defiant attitude toward CYFD with a mental disorder or incapacity.

7

{14} Section 32A-4-2(E)(4) defines a neglected child as one "whose parent, guardian or custodian is unable to discharge that person's responsibilities to and for the child because of [a] . . . mental disorder or incapacity[.]" This section requires proof by clear and convincing evidence that the individual suffers from a mental disorder or incapacity and that such mental disorder or incapacity "render[s] the parent unable to provide proper parental care or discharge his or her responsibilities to the child." *Amanda H.*, 2007-NMCA-029, ¶ 25; *See* Section 32A-4-2(E)(4).

{15} The terms " mental disorder" and "mental incapacity" as used in Section 32A-4-2(E)(4) have not been specifically construed. In construing this provision, "we must ascertain and give effect to the intention of the Legislature." *Stang v. Hertz Corp.*, 1969-NMCA-118, ¶ 17, 81 N.M. 69, 463 P.2d 45. "[T]he plain language of a statute is the primary indicator of legislative intent." *High Ridge Hinkle Joint Venture v. City of Albuquerque*, 1998-NMSC-050, ¶ 5, 126 N.M. 413, 970 P.2d 599 (internal quotation marks and citation omitted). Furthermore, we consider the language of the statute as a whole and construe it "so that no word and no part of the statute is rendered surplusage or superfluous." *Stang*, 1969-NMCA-118, ¶ 17.

{16} In accordance with these principles, two points are readily apparent. First, the Legislature intended the conditions listed under Section 32A-4-2(E)(4) to be grounds for adjudicating a child neglected distinct from those found in Section 32A-4-2(E)(2)

8

(stating that a "neglected child means a child . . . who is without proper parental care and control or subsistence, education, medical or other care or control necessary for the child's well-being because of the faults or habits of the child's parent, guardian or custodian or the failure or refusal of the parent, guardian or custodian, when able to do so, to provide them"). Second, the Legislature intended mental incapacity to be a separate condition from mental disorder.

{17} In first considering the distinction between Section 32A-4-2(E)(2) and 32A-4-2(E)(4), the distinguishing feature under Section 32A-4-2(E)(4) is the requirement that CYFD establish by clear and convincing evidence that one of the listed conditions—such as a mental disorder or incapacity—is the cause of the parent's inability to discharge his or her responsibilities to the child. *See Amanda H.*, 2007-NMCA-029, ¶ 25 (stating that establishing one of the conditions listed in Section 32A-4-2(E)(4) is insufficient to support an adjudication that the child is neglected but must instead be the reason the parent is unable to discharge his or her responsibilities to the child). In contrast, under Section 32A-4-2(E)(2) it is sufficient that the parent's failure to care for the child's well-being is a result "of the faults or habits of the . . . parent." This provision, as opposed to Section 32A-4-2(E)(4), requires culpability on the part of the parent. *See Shawna C.*, 2005-NMCA-066, ¶ 29; *see also Amanda H.*, 2007-NMCA-029, ¶ 21 ("To properly find that [the c]hild was neglected under

9

[Section 32A-4-2(E)(2)], the district court must have been presented with clear and convincing evidence of Mother's culpability through intentional or negligent disregard of [the c]hild's well-being and proper needs."). Thus, when CYFD proceeds under Section 32A-4-2(E)(4), it is not required to prove culpable behavior of the parent, but it also cannot rely on evidence of the parent's negligent or intentional disregard of the child's needs. Instead, CYFD must establish the "status" that makes the individual unable to discharge his or her parental responsibilities and show the connection between that status and the neglect or abuse. *See Shawna C.*, 2005-NMCA-066, ¶ 29; *see also Amanda H*, 2007-NMCA-029, ¶ 25 ("The unfavorable personal status of the parent . . . is relevant only to the extent that it prompts either the harms defined as abuse, or the neglect." (internal quotation marks and citation omitted)).

{18} Second, the plain meaning of the terms "mental disorder or incapacity" in Section 32A-4-2(E)(4) indicates that the Legislature intended these terms to refer to two separate conditions. In *Shawna C.*, this Court noted that the statute was amended in 1987 to include the word "disorder" to clarify "the circumstances in which a parent's inability to function as a parent would constitute neglect without a showing of culpability." 2005-NMCA-066, ¶ 35. We believe the purpose of this amendment was to clarify that mental illness was an included "status" under Section 32A-4-

10

2(E)(4). In this regard, *Black's Law Dictionary* 1135 (10th ed. 2014) defines "mental disorder" and "mental illness" synonymously. Mental illness is defined as evidencing "a disorder in thought or mood so substantial that it impairs judgment, behavior, perceptions of reality, or the ability to cope with the ordinary demands of life." This definition comports with the definition of mental disorder used elsewhere in our statutes. *See* NMSA 1978, § 43-1-3(O) (2013) (defining mental disorder as the "substantial disorder of a person's emotional processes, thought or cognition that grossly impairs judgment, behavior or capacity to recognize reality, but does not mean developmental disabilit[ies]").

{19}     The term "incapacity," on the other hand, is defined in *Black's Law Dictionary* 878 (10th ed. 2014) as a "[l]ack of physical or mental capabilities." In this case, we are concerned with mental capabilities. In *State ex rel. Health & Social Services Department v. Natural Father*, this Court stated that "a child is neglected if the parents lack the mental capacity to provide the care or control necessary for the child's well-being." 1979-NMCA-090, ¶ 9, 93 N.M. 222, 598 P.2d 1182. Consistent with *Black's Law Dictionary* and *Natural Father*, our probate code, in the context of the parent/child relationship, defines "incapacity" as the "inability of an individual to function as a parent of a child because of the individual's physical or mental condition[.]" NMSA 1978, § 45-2-115(H) (2011). In construing a similar term, the

Nebraska Supreme Court distinguished "mental deficiency" from "mental illness" in defining mental deficiency as "an impairment in learning capacity such that one is unable to profit from instruction and acquire parenting skills."). *In re D.L.S.*, 432 N.W.2d 31, 38 (Neb. 1988) (internal quotation marks and citation omitted) . Taking these definitions into consideration, we believe that the Legislature intended mental incapacity to encompass those circumstances in which an individual, due to an intellectual disability, is unable, as opposed to unwilling, to discharge his or her responsibilities to the child.

{20} Turning to the district court's decision in this case, we determine that the district court's findings did not support a conclusion that Child was neglected pursuant to Section 32A-4-2(E)(4). The district court entered no written findings of fact. We therefore consider its statements at the conclusion of the hearing to clarify the basis of its decision. *See Ledbetter v. Webb*, 1985-NMSC-112, ¶ 36, 103 N.M. 597, 711 P.2d 874 (indicating that the district court's verbal comments can be used to clarify ruling). The district court did not make any finding that Mother suffered from a mental disorder or illness. Nor did it find that Mother suffered from mental incapacity. The district court explicitly stated that Mother was "capable of learning and mastering info" and that she was a "bright woman" who showed a "capacity to learn." We understand these findings to be in direct contradiction to a determination

that Mother lacked the intellectual capacity to "profit from instruction and acquire parenting  skills." *D.L.S.*, 432 N.W.2d at 38.

{21} Furthermore, the determinative factor in the district court's decision was Mother's defiant attitude toward CYFD. Testimony at the hearing indicated that Mother displayed an unwillingness to accept feedback and instruction from CYFD with which she disagreed and that this dynamic grew worse after Mother was given the results of the mind map assessment. While the district court stated that Mother's defiant attitude was affecting her ability to recognize the conditions she needed to improve in order to safely parent Child, we conclude that such findings may be relevant to establishing that the faults and habits of Mother render her unwilling to provide proper parental care under Section 32A-4-2(E)(2), but they are not sufficient to show that Child is neglected under Section 32A-4-2(E)(4). Stated another way, we are unprepared to conclude that evidence of a defiant attitude toward CYFD constitutes a mental disorder or incapacity under the Abuse and Neglect Act. Accordingly, the district court erred in concluding that CYFD established by clear and convincing evidence that Child was neglected pursuant to Section 32A-4-2(E)(4).

**Dr. Pierce's Testimony**

{22} While the parties' briefing largely focused on Dr. Pierce's testimony regarding Mother's mind map and whether, as a general matter, expert testimony is required to establish the existence of a mental disorder or incapacity sufficient to adjudicate a child neglected under Section 32A-4-2(E)(4), we need not address it. The district

14

court's comments did not suggest any reliance on Dr. Pierce's testimony, and the court's verbal findings regarding Mother's defiance of CYFD were not supported by Dr. Pierce's testimony. Indeed, Dr. Pierce testified that the mind map was not a diagnostic tool. While we acknowledge that there may be cases in which expert testimony is not required, *cf. Richter v. Presbyterian Healthcare Servs.*, 2014-NMCA-056, ¶ 19, 326 P.3d 50 (noting that in some instances expert testimony is not required to prove instances of medical negligence), *cert. denied*, 2014-NMCERT-005, 326 P.3d 1111, we observe that it is unlikely that a finding of neglect under the "mental disorder or incapacity" element of Section 32A-4-2(E)(4) could be sustained by anything other than a diagnosis supported by the evidentiary reliability of the underlying scientific knowledge. *See State v. Torres*, 1999-NMSC-010, ¶ 24, 127 N.M. 20, 976 P.2d 20 (explaining that "it is error to admit expert testimony involving scientific knowledge unless the party offering such testimony first establishes the evidentiary reliability of the scientific knowledge"). Accordingly, to the extent the district court's order can be construed as relying on Dr. Pierce's opinion that Mother functions at a lower cognitive ability, we do not believe this opinion was properly supported.

**CONCLUSION**

{23}    For the foregoing reasons, we reverse the district court's judgment of adjudication and remand for proceedings consistent with this Opinion.

{24}    **IT IS SO ORDERED.**

_____
**CYNTHIA A. FRY, Judge**

**WE CONCUR:**

_____
**MICHAEL E. VIGIL, Chief Judge**

_____
**M. MONICA ZAMORA, Judge**