This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

No. A-1-CA-38024

**STATE OF NEW MEXICO ex rel.
CHILDREN, YOUTH & FAMILIES
DEPARTMENT,**

Petitioner-Appellee,

v.

**CHRISTINA L.,**

Respondent-Appellant,

**IN THE MATTER OF JUSTIN L.,**

Child.

**APPEAL FROM THE DISTRICT COURT OF SANDOVAL COUNTY
Allen R. Smith, District Judge**

Children, Youth & Families Department
Rebecca J. Liggett, Chief Children's Court Attorney
Santa Fe, NM
Kelly P. O'Neill, Children's Court Attorney
Albuquerque, NM

for Appellee

Law Offices of Nancy L. Simmons, P.C.
Nancy L. Simmons
Albuquerque, NM

for Appellant

Sherrie Lee Trescott
Rio Rancho, NM

Guardian Ad Litem

**DECISION**

**MEDINA, Judge.**

**{1}**     Christina L. (Mother) appeals the termination of her parental rights to Justin L. (Child). For the reasons that follow, we affirm.

**BACKGROUND**

**{2}**     Because of the protracted nature of the events at issue in this case, we first set out a brief procedural history of Mother's involvement with the Children, Youth and Families Department (CYFD). Prior to the most recent adjudication of abuse and neglect and the termination of Mother's parental rights, Mother was the subject of multiple abuse and neglect petitions involving Child.

**{3}**     CYFD filed the first abuse and neglect petition in 2006. Mother stipulated that Child was neglected. The district court placed Child in custody of CYFD, which in turn placed Child in the foster care of an unrelated couple (Foster Parents). Child was reunified with Mother in 2008.

**{4}**     In 2009, CYFD filed a second abuse and neglect petition alleging physical abuse of Child and domestic violence in Mother's home. The district court adjudicated Child as neglected and again placed him in foster care with Foster Parents. Mother's parental rights were subsequently terminated in 2011. In 2012, this Court reversed the 2009 adjudication and reinstated Mother's parental rights. *See State ex rel. Children, Youth & Families Dep't v. Christina L.*, No. 31,151, mem. op. 12 (N.M. Ct. App. Sept. 18, 2012) (non-precedential). However, Child remained in CYFD's custody and in the care of Foster Parents.

**{5}**     In 2014, CYFD filed a third abuse and neglect petition alleging that Mother was "unable to discharge her responsibilities to and for [C]hild because of incarceration[,] hospitalization[,] or physical or mental disorder or incapacity." Due to Mother's mental disorder or incapacity, the district court adjudged Child as neglected. During this time, the permanency plan in place for Child was adoption. CYFD allowed Child to move with Foster Parents to Nebraska in 2015 out of concerns regarding Child's wellbeing, including that he may develop "reactive attachment disorder" if separated from Foster Parents. This Court reversed the 2014 adjudication in *State ex rel. Children, Youth & Families Dep't v. Christina L.*, 2015-NMCA-115, 362 P.3d 155. CYFD prepared a transition plan for Child's return to New Mexico and the district court changed Child's permanency plan from adoption to reunification in August 2016.[1]

---

1During this time, the court-appointed guardian ad litem filed a motion to terminate Mother's parental rights and objected to the proposed transition plan. The district court denied the guardian's motion.

**{6}** On October 12, 2016, CYFD filed a fourth petition alleging Child, approximately ten years old at the time, was abused and neglected by Mother. The petition alleged in part that Mother: (1) was in a relationship that had ongoing domestic violence issues, including allegations of sexual assault with W. Schaedel; (2) her home was unsanitary and had medications in the home that were not hers; and (3) her diagnosis of "borderline personality disorder with narcissistic personality tendencies and antisocial personality features" impacted her ability to care for Child.

**{7}** On April 19, 2017, the district court adjudged Child as abused and neglected, finding that: (1) "[Child] is at risk of suffering serious harm because of the action or inaction of [C]hild's parent, pursuant to [NMSA 1978,] Section 32A-4-2(B)(1) [(2016)]"[2]; and (2) "[Mother] is unable to discharge her parental responsibilities to and for [Child] because of [her] mental disorder, pursuant to  Section 32A-4-2(F)(4) [(2016)]." The district court also found that: "[d]espite repeated chaotic incidences and domestic violence between [Mother] and Schaedel, [Mother] continued to maintain a relationship with Schaedel, including inviting him into her home, which was dangerous to herself, to caseworkers, and to providers who came into her home," and "[Mother] is likely to continue in relationships with individuals who are abusive, and she lacks the protective capacities to protect herself and her son from these individuals."

**{8}** The district court ordered CYFD to implement a court-approved treatment plan, which included: participating in individual Dialectical Behavioral Therapy (DBT);[3] obtaining parenting skills and demonstrating learned skills during time with Child; maintaining "healthy relationships free of criminal activities and domestic violence with significant others and family members"; obtaining and maintaining a "safe and stable living environment free of domestic violence, substance abuse and criminal activity"; participating in Child's health-related appointments; staying in regular contact with CYFD and service providers; and participating in visits with Child. Mother appealed the adjudication of abuse and neglect. This Court affirmed. *See State ex rel. Children, Youth & Families Dep't v. Christina L.*, No. 36,484, mem. op. (N.M. Ct. App. Nov. 21, 2017) (non-precedential).

**{9}** On April 27, 2018, CYFD moved to terminate Mother's parental rights, alleging that Mother failed to make significant progress in fulfilling the court ordered treatment plan. The court held a termination of parental rights (TPR) hearing on August 27 and 28, 2018, in which it heard the following testimony.

**{10}** Paula Raley, Mother's behavior health counselor at the time of the TPR hearing, testified about Mother's diagnosis and treatment progress. Raley began treating Mother in early 2015 and diagnosed her with borderline personality disorder and depression. Raley testified that people diagnosed with borderline personality disorders might exhibit patterns of unstable and intense interpersonal relationships, difficulty controlling anger,

---

2Any further citations to Section 32A-4-2 are to the 2016 version.

3Participation in DBT was also a requirement of Mother's previous court-approved treatment plans since February 2015.

and chronic feelings of emptiness in addition to other issues. Raley's diagnosis of Mother had not changed at the time of the TPR hearing.

{11}    Mother's counseling sessions with Raley focused on developing interpersonal relationship skills, emotional regulation skills, and utilizing the DBT skills. Raley characterized Mother's progress in skill building and identifying safety concerns as slow, although Mother could identify issues in hindsight. However, Mother still struggled with trust issues and transparency and had difficulty being fully honest. Mother also struggled with developing better interpersonal skills and tended to idealize relationships and accept new people more readily without caution.

{12}    Dr. Christopher Alexander, a licensed clinical psychologist testified that he performed a psychological evaluation of Mother in 2007, a neuropsychological evaluation in 2010, and a clinical interview in 2016. Dr. Alexander was unable to perform a full evaluation in 2016 because Mother arrived late to her scheduled appointment. Nevertheless, he diagnosed Mother with cannabis use disorder, an unspecified trauma and/or a stressor-related disorder, an unspecified mood disorder, and an unspecified personality disorder. Dr. Alexander testified that Mother views relationships in terms of power and control and likely seeks out drama in relationships to alleviate feelings of abandonment. While Dr. Alexander could not say if his evaluations were accurate as of the date of trial, he testified that he would not expect significant change in terms of Mother's personality components because they are a fairly static part of a person.

{13}    During the times that he saw Mother, Dr. Alexander recommended that she participate in DBT, which is a specialized treatment for individuals with borderline personality disorder. He also recommended domestic violence counseling, substance abuse evaluation and treatment, as well as parental education. Dr. Alexander opined that regardless of the treatments implemented, long-term intervention would be required to address Mother's needs.

{14}    After reviewing a treatment summary written by Raley, Dr. Alexander stated that he believed her evaluation of Mother was consistent with his previous diagnosis. Dr. Alexander also expressed concern that Mother had made limited progress despite three years of work with Raley.

{15}    Dr. Alexander also evaluated Child in 2016 and diagnosed him with attention deficit hyperactivity disorder (ADHD), autism spectrum disorder without intellectual impairment, and an unspecified disruptive behavior disorder. Child's autism spectrum disorder causes difficulty with communication and social skills. Given his autism diagnosis, Dr. Alexander opined that it is important to focus on developing Child's social skills and life skills. Dr. Alexander further testified that providing structure, routine, and consistency were important to addressing Child's ADHD diagnosis. With regard to Mother's ability to parent Child, Dr. Alexander expressed concern that Mother's mental health problems may result in boundary confusion because she would likely need more attention from Child than he could provide—in part due to his own diagnosis.

**{16}** Margret Kempert, a licensed mental health counselor at Albuquerque Behavioral Health (ABH), testified about Mother's progress in therapy. CYFD referred Mother to ABH in late 2017 to build coping skills. Mother participated in Kempert's Seeking Safety program to address post-traumatic stress and her DBT group. Kempert testified that Mother started DBT group sessions in February 2018, which utilized workbook exercises. Mother initially struggled with some of the DBT exercises by either not completing or incorrectly completing workbook materials. Mother completed seven out of ten chapters of the DBT workbook before she stopped attending sessions.

**{17}** Mother demonstrated a basic understanding of the DBT skills taught and was able to utilize the skills in a group setting. However, Kempert was unable to observe Mother utilizing DBT skills outside of the group setting. Although Mother missed one class in June 2018 due to illness, she failed to call and provide a reason for missing three additional classes that month and ABH dropped her from the group. Mother last attended the DBT group in late May 2018.

**{18}** Cantrell Mosley, a CYFD permanency planning unit supervisor, testified to CYFD's interactions with Mother and its efforts to aid Mother to ameliorate the causes and conditions of abuse and neglect.

**{19}** Mosley testified that in 2013 the transition plan in place included one-on-one parenting therapy sessions with a provider that also treated Child, as well as visits between Mother and Child at the CYFD office. From 2014 to 2015, supervised visits occurred at least once a week at CYFD offices. Overall, supervised visits went well. If concerns arose, CYFD would discuss the issue with Mother and they were resolved.

**{20}** Foster Parents decided to move to Nebraska in 2015, at which time CYFD determined that it was in Child's best interest for him to move with Foster Parents. CYFD based its determination, in part, on a therapeutic recommendation by Southwest Family Guidance Center (SFGC), citing a concern that Child may develop reactive attachment disorder if separated from Foster Parents whom he viewed as parent figures. CYFD also considered that the permanency plan in place was for Child's adoption and its ongoing concerns about Mother's case.

**{21}** CYFD held a meeting with Mother, her attorney, Foster Parents, and therapists regarding the move to Nebraska. The participants discussed continued contact between Mother and Child, and CYFD agreed to help Foster Parents bring Child back to New Mexico for visits every other month. To facilitate phone calls with Child in Nebraska, CYFD initially referred Mother to an agency that would provide Mother with support and monitor the phone calls. However, Mother had trouble finding transportation to the agency's office and she missed some of her scheduled calls. As a consequence, CYFD permitted Mother to call Child from her own home.

**{22}** To facilitate Mother's participation in Child's services while he was in Nebraska, CYFD scheduled times for mother to call in to participate in appointments, including some in 2017. However, Mother was unable to participate in Child's therapy or receive

updates from Child's providers in Nebraska, because the therapists, who were not licensed in New Mexico, did not believe they could provide services to Mother. However, CYFD provided Mother with updates on Child's treatment and discussed his wellbeing during meetings. CYFD also provided Mother with information through court reports it prepared that included names of providers, dates of appointments, and any available information on Child's progress.

**{23}**　In February 2016, CYFD began time-limited visitations between Mother and Child, including visitation in Mother's home and one unsupervised visit. During an unsupervised visit in April 2016, two men were present in Mother's home. CYFD confronted Mother about the men, but Mother refused to identify who they were. CYFD informed Mother that she was the only person allowed in the home during unsupervised visits. CYFD later determined that one of the men was Schaedel.

**{24}**　Thereafter, supervised visits went well and as of the TPR hearing Mother had three unsupervised visits with Child. In addition to facilitating visitations, CYFD referred Mother to multiple therapists during the pendency of the case. With regard to Mother's participation in DBT, Mosley testified that CYFD attempted to place Mother in DBT in 2014 but was unable to secure services until February 2015 due to a lack of available services. Mosley testified that she was very concerned that Mother discontinued DBT.

**{25}**　Although Mother mostly complied with her treatment plan by providing contact information to CYFD, she did not identify a friend that she proposed to live with if Child returned to her custody, nor did she facilitate a home visit at the proposed location. At a prior hearing, Mother disclosed to CYFD that she could live with a woman named Aubrey but did not provide any more information, including Aubrey's last name. Mosley testified that she discovered that Aubrey had prior interactions with CYFD through Mother's testimony at the TPR hearing.

**{26}**　Mosley also learned for the first time through Mother's testimony that she lived for a month with a woman named Kelly. Prior to the TPR hearing CYFD questioned Mother about police reports involving an individual named Kelly. Mother stated that she and Kelly had arguments and fought but never disclosed that they lived together.

**{27}**　Mosley testified that CYFD would not allow Child to live with Mother at Child's maternal grandmother's (Grandmother) home because Grandmother's parental rights to her own children had been terminated over lack of supervision and sexual abuse of her children by maternal grandfather (Grandfather). Mosley also expressed concern that Mother: continued to have contact with Grandfather; and that the Valencia County Sherriff's Department received calls regarding fights between Mother and Grandmother on several occasions.

**{28}**　During one home visit to Grandmother's residence, Mosley expressed concern that Mother and Grandmother smoked inside of the home while Grandmother used an oxygen machine. Mosley discussed the risks of smoking near the oxygen machine with

Mother. Mother did not appear to understand the danger and instead responded that they were allowed to smoke in the residence.

**{29}** Mosley further testified that a plan to transition Child back to New Mexico in late 2016 failed when CYFD found Schaedel and another man in Mother's home during an unannounced visit in September 2016. At that time CYFD found out that Mother had previously accused Schaedel of raping her. CYFD also discovered other incidents occurring in the home involving Schaedel and police officers, and that Mother allowed Schaedel in her home on other occasions after the alleged rape. When confronted about her interactions with Schaedel, Mother told CYFD that she would continue to let him into the home. Mosley also testified that Mother had since indicated that she is in a relationship but refused to disclose with whom.

**{30}** Mother testified about her treatment progress and offered explanations for issues raised during the hearing. Mother stated that she currently lived with Grandmother but that she would live with a friend if Child is returned. However, Mother could not recall her friend's full name and stated that her friend does not want to interview with CYFD or submit to a home inspection. Mother stated that CYFD has never provided a clear answer as to why it has issues with Grandmother.

**{31}** With regard to Schaedel, Mother admitted that she allowed him into her home on more than one occasion, but stated that she kept track of his whereabouts for her own protection. Mother also admitted to lying about Schaedel's identity to CYFD during the unannounced visit in 2016.

**{32}** With regard to Child's medical treatment in Nebraska, Mother testified that she received little information from Child's providers. Mother attributed the lack of communication to the physical distance between New Mexico and Nebraska rather than the patient confidentiality issues. Mother does believe that DBT helped her address her issues and testified that she could learn to communicate better with therapy.

**{33}** At the conclusion of the second day of the hearing, the district court granted CYFD's motion to terminate Mother's parental rights, concluding that Mother was unlikely to change the conditions and causes of her abuse and neglect of Child within the foreseeable future despite CYFD's reasonable efforts to assist her. In addition to its order, the court issued extensive findings of fact and conclusions of law. This appeal followed.

## DISCUSSION

**{34}** Mother makes three arguments on appeal. First, Mother contends there was insufficient evidence that she was unlikely to change the conditions and causes of her abuse and neglect of Child in the foreseeable future. Second, Mother contends there was insufficient evidence that CYFD made reasonable efforts to reunify the family. Third, Mother contends that the district court failed to explore alternatives to termination of her parental rights. We address each argument in turn.

**Standard of Review**

**{35}** NMSA 1978, Section 32A-4-28(B)(2) (2005) of the Abuse and Neglect Act (ANA) provides that the district court shall terminate parental rights if

> the child has been neglected or abused as defined in the [ANA] and the court finds that the conditions and causes of the neglect and abuse are unlikely to change in the foreseeable future despite reasonable efforts by [CYFD] to assist the parent in adjusting the conditions that render the parent unable to properly care for the child.

CYFD must demonstrate these elements by clear and convincing evidence. *See State ex rel. Children, Youth & Families Dep't v. Vanessa C.*, 2000-NMCA-025, ¶ 24, 128 N.M. 701, 997 P.2d 833. "Clear and convincing evidence is . . . evidence that instantly tilts the scales in the affirmative when weighed against the evidence in opposition and the fact[-]finder's mind is left with an abiding conviction that the evidence is true." *State ex rel. Children, Youth & Families Dep't v. Lance K.*, 2009-NMCA-054, ¶ 16, 146 N.M. 286, 209 P.3d 778 (alteration, internal quotation marks, and citation omitted).

**{36}** In reviewing a claim challenging the sufficiency of the evidence, we must determine whether the district court's decision is supported by substantial evidence of a clear and convincing nature.[4] *See State ex rel. Children, Youth & Families Dep't v. Alfonso M.-E.*, 2016-NMCA-021, ¶ 26, 366 P.3d 282. "Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support a conclusion." *Id.* (internal quotation marks and citation omitted). "We will uphold the district court's judgment if, viewing the evidence in the light most favorable to the judgment, a fact[-]finder could properly determine that the clear and convincing standard was met." *State ex rel. Children, Youth & Families Dep't v. Hector C.*, 2008-NMCA-079, ¶ 11, 144 N.M. 222, 185 P.3d 1072 (internal quotation marks and citation omitted). Hence, we ask "whether the [district] court's conclusion, when viewed in the light most favorable to the decision below, was supported by substantial evidence, not whether the [district] court could have reached a different conclusion." *State ex rel. Children, Youth & Families Dep't v. Patricia H.*, 2002-NMCA-061, ¶ 31, 132 N.M. 299, 47 P.3d 859.

**Likelihood of Change in the Foreseeable Future**

**{37}** Mother argues that CYFD failed to prove by clear and convincing evidence that she would be unable to ameliorate the causes and conditions of neglect in the foreseeable future. "We have interpreted the term 'foreseeable future' to refer to corrective change within a reasonably definite time or within the near future." *Id.* ¶ 34

---

4In making this argument, Mother briefly asserts that because termination implicates her fundamental right to raise her Child, the district court should have applied strict scrutiny to its decision. Mother does not develop this argument further, nor does she provide relevant case law to illustrate how our standard of review does not adequately protect her fundamental rights. Because Mother's argument is undeveloped, we decline to address it. *See State ex rel. Children, Youth & Families Dep't v. Marsalee P.*, 2013-NMCA-062, ¶ 20, 302 P.3d 761 (recognizing that this Court does not review unclear or undeveloped arguments).

(internal quotation marks and citation omitted). In reviewing the district court's determination that a parent was unlikely to change the conditions and causes of abuse in the foreseeable future, we keep in mind that the district court must "give primary consideration to the physical, mental and emotional welfare and needs of the child[.]" Section 32A-4-28(A). Accordingly, "in balancing the interests of the parents and children, the [district] court is not required to place the children indefinitely in a legal holding pattern." *Patricia H.*, 2002-NMCA-061, ¶ 34 (internal quotation marks and citation omitted).

**{38}** Viewing the evidence in the light most favorable to the judgment, we conclude there was substantial evidence of a clear and convincing nature that the conditions and causes of Mother's abuse and neglect were unlikely to change in the foreseeable future. Evidence at the TPR hearing showed that Mother continued to exhibit an inability to appropriately identify and avoid dangerous situations and that she did not appreciate the effect her decisions could have on Child.

**{39}** Both Dr. Alexander and Raley diagnosed Mother with borderline personality disorder and opined that persons with such a diagnosis tend to exhibit issues in their relationships, often seeking out drama to alleviate feelings of abandonment and cultivating unstable and intense interpersonal relationships. Although both Dr. Alexander and Raley believed that Mother could address these issues through DBT, Raley testified that Mother's progress in treatment was slow and that Mother still struggled to recognize healthy and unhealthy relationships. Dr. Alexander also expressed concern that Mother had made little progress since his evaluations. Indeed, despite completing a majority of the DBT group exercises before removal from the program, Mother continued to exhibit relationship issues associated with borderline personality disorder.

**{40}** Mosley testified to multiple incidents in which Mother continued a relationship with Schaedel, a man whom Mother had accused of sexually assaulting her. Mother admitted to allowing Schaedel back into her home on multiple occasions after he allegedly raped her and stated that she would continue to allow him into her home.

**{41}** At the time of the TPR hearing, Mother was living with Grandmother despite CYFD's expressed concerns regarding altercations between Mother and Grandmother involving the police and Mother's failure to grasp the danger of smoking in the home while Grandmother used an oxygen machine. Moreover, Mosley testified that she believed Mother still interacted with her Grandfather, an individual who also had his parental rights terminated due to abuse and neglect.

**{42}** Equally concerning was Mother's lack of candor and cooperation with CYFD when it came to her relationships and living arrangements. When CYFD performed an unannounced visit to Mother's home in September 2016 and found Schaedel there, Mother lied to the case worker, stating that he was somebody else. During the TPR hearing, Mother attempted to blame her deception on Schaedel, stating that he told her not to provide CYFD his identity. But regardless of what Schaedel may have told her,

this does not diminish Mother's role in failing to cooperate with CYFD and provide truthful information. Mother admitted to being in a relationship with someone but steadfastly refused to identify the individual. Mosley also testified that she first learned that Mother lived with a friend named Kelly through Mother's testimony at the TPR hearing. Additionally, although Mother testified that she and Child would live with a friend named Aubrey if he returned, Mother could not provide Aubrey's full name, admitted that Aubrey had been involved with CYFD before, and refused to allow CYFD to conduct a home visit.

**{43}** This evidence is sufficient to show that Mother continued to engage in behaviors that led to the adjudication of abuse and neglect, i.e. maintaining potentially dangerous relationships. Additionally, Mother's lack of transparency and cooperation with CYFD regarding these relationships showed that, despite receiving treatment to address these issues for over three years, Mother continued to fail to understand the dangers her relationships pose to Child. Mother's lack of progress in this regard supports the district court's conclusion that she was unlikely to ameliorate the causes and conditions of abuse and neglect in the foreseeable future. *See Vanessa C.*, 2000-NMCA-025, ¶ 29 (concluding that "[a]fter two years with limited or no long-term or sustained progress being made, we believe the [district] court could find that there was clear and convincing evidence that the causes and conditions of neglect would not change in the foreseeable future").

**{44}** Mother next argues that CYFD failed to affirmatively prove that she could not change the conditions and causes of the abuse and neglect in the foreseeable future, instead transferring the burden to Mother to prove the converse. In support of this argument, Mother cites *Alfonso M.-E.*, in which this Court held that the district court erroneously shifted the burden of proof to the father by holding an "informational deficit regarding [his] alcohol and substance use against him." 2016-NMCA-021, ¶ 37. Mother's reliance on *Alfonso M.-E.* is misplaced. Unlike *Alfonso M.-E.*, we fail to perceive any "informational deficit" regarding Mother's inconsistent efforts to alleviate the causes and conditions of abuse and neglect, nor is there any indication in the record that the district court improperly shifted the burden to Mother in this case. *See id.*

**{45}** Mother also argues that the evidence was insufficient because CYFD failed to present current evidence of her inability to properly care for Child, instead relying on past problems to "bootstrap" the conclusion that Mother could not change. Mother asserts that CYFD's reliance on evidence that she did not complete her DBT group and her ongoing relationship with Grandmother were not sufficient to meet its burden. These arguments oversimplify the evidence presented. Mother ignores the substantial testimony outlined above evidencing a multitude of incidents in which Mother continued to engage in potentially dangerous relationships.

**{46}** Mother also appears to argue that the district court based its decision to terminate her parental rights on an improper comparison of the home environment Foster Parents were able to provide Child. *See Patricia H.*, 2002-NMCA-061, ¶ 21 ("The fact that a child might be better off in a different environment is not a basis for

termination of parental rights in this state." (internal quotation marks and citation omitted)). However, Mother fails to support this argument with any citation to the record indicating the district court based its decision to terminate her parental rights on such an improper comparison, as opposed to evidence of Mother's inability to properly care for Child. *See* Rule 12-318(A)(4) NMRA (stating that an appellant shall support her argument "with citations to authorities, record proper, transcript of proceedings, or exhibits relied on"). Accordingly, we decline to address this argument. *See State ex rel. Children, Youth & Families Dep't v. Senaida C.*, 2008-NMCA-007, ¶ 27, 143 N.M. 335, 176 P.3d 324 (declining to address arguments unsupported by citations to the record or relevant authority); *see also Farmers, Inc. v. Dal Mach. & Fabricating, Inc.*, 1990-NMSC-100, ¶ 8, 111 N.M. 6, 800 P.2d 1063 (stating that the appellate courts presume that the district court is correct, and the burden is on the appellant to clearly demonstrate error).

**Reasonable Efforts**

{47}     Mother next argues that CYFD failed to make reasonable efforts to reunify her family.

{48}     We consider the totality of the circumstances when reviewing the district court's determination that CYFD made reasonable efforts to assist the parent. *State ex rel. Children, Youth & Families Dep't v. Keon H.*, 2018-NMSC-033, ¶ 41, 421 P.3d 814. "Efforts to assist a parent may include individual, group, and family counseling, substance abuse treatment, mental health services, transportation, child care, and other therapeutic services." *Id.* (internal quotation marks and citation omitted). "[W]hat constitutes reasonable efforts may vary with a number of factors, such as the level of cooperation demonstrated by the parent and the recalcitrance of the problems that render the parent unable to provide adequate parenting." *Id.* (internal quotation marks and citation omitted). "[W]e also consider the duration of reunification services provided to a parent by CYFD prior to resorting to termination." *Alfonso M.-E.*, 2016-NMCA-021, ¶ 54. In the end, "our job is not to determine whether CYFD did everything possible; our task is limited by our statutory scope of review to whether CYFD complied with the minimum required under law." *Patricia H.*, 2002-NMCA-061, ¶ 28.

{49}     Viewing the evidence in the light most favorable to the judgment, we conclude there was substantial evidence of a clear and convincing nature that CYFD made reasonable efforts to assist Mother. This case presents a long history between Mother and CYFD. Child first came into custody of CYFD in 2006 and although he returned to Mother in 2008, he was removed again in 2009 and has lived with Foster Parents since. By the time of the termination of Mother's parental rights in 2019, Mother had been subject to a treatment plan for over a decade and Child's permanency plan had oscillated between reunification and adoption multiple times. Despite this long history, the evidence shows that CYFD continued to support Mother.

{50}     CYFD set up a psychological evaluation for Mother with Dr. Alexander in 2016, who recommended she receive domestic violence counseling, parent education, and

DBT to address her borderline personality disorder. CYFD referred Mother to Raley, a behavioral health counselor, who treated her utilizing DBT beginning in 2015 up until the time of the TPR hearing. CYFD also referred Mother to Kempert, a licensed mental health provider, in 2017 to address post-traumatic stress. Kempert also facilitated group DBT sessions for Mother beginning in February 2018 until Mother was dropped from the program in June 2018 after she failed to show up for three sessions.

**{51}**  In addition to therapeutic support, CYFD facilitated visitation between Mother and Child including supervised and telephonic visits. From 2014 to 2015, supervised visits occurred at least once a week at CYFD offices. When Child moved to Nebraska in 2015, CYFD helped Foster Parents bring Child back to New Mexico every other month for visits with Mother. CYFD also referred Mother to a monitoring agency to provide support during her telephonic visits with Child. And, because Mother had issues finding transportation to the monitoring agency, CYFD eventually allowed Mother to call Child from her home. In 2016, CYFD facilitated time-limited visitations and allowed Mother to have an unsupervised visit with Child. However, because of the issues that occurred during that visit, CYFD again began supervising Mother's visits with Child. Eventually, supervised visits went well enough to warrant unsupervised visitation and CYFD facilitated three unsupervised visits between March 2018 and the date of the TPR hearing.

**{52}**  Mother argues that CYFD failed to act reasonably when it allowed Child to move to Nebraska with Foster Parents, instead of placing Child with a new foster family, and that it also failed to support Mother's relationship with Child after he moved. Although Mother alleges that CYFD acted unreasonably, she ignores evidence showing that CYFD considered multiple factors before determining that it was in Child's best interest to move to Nebraska with Foster Parents. Mosley testified that CYFD considered a therapeutic recommendation by SFGC that expressed a concern that Child could develop reactive attachment disorder if separated from Foster Parents, whom he had lived with since 2009. Additionally, CYFD considered that the permanency plan in place was for Child's adoption and cited ongoing concerns about Mother's case. Finally, CYFD held a meeting with Mother, Foster Parents, and therapists to discuss the move. Given this evidence, including testimony regarding SFGC's recommendation, we conclude CYFD's decision to allow Child to move to Nebraska was not unreasonable, as Mother contends. *See State ex rel. Children, Youth & Families Dep't v. Maria C.*, 2004-NMCA-083, ¶ 53, 136 N.M. 53, 94 P.3d 796 ("Courts must also recognize that the child's best interest is paramount throughout the proceedings.").[5]

---

5Mother argues in her reply that "the State of New Mexico is not permitted . . . to make a choice that favors . . . [C]hild's best interest over the parent's fundamental right to custody of her [C]hild[,]" and cites *Patricia H.*, 2002-NMCA-061, ¶ 21, to support the assertion. Acknowledging that the proposition cited in *Patricia H.* applies to the termination of parental rights rather than custody decisions by CYFD, Mother appears to ask us to consider Child's move to Nebraska an effective termination but provides no statute or case law to support such a conclusion. "We assume where arguments in briefs are unsupported by cited authority, counsel after diligent search, was unable to find any supporting authority. We will not do this research for counsel. Issues raised in appellate briefs which are unsupported by cited authority will not be reviewed by us on appeal." *In re Adoption of Doe*, 1984-NMSC-024, ¶ 2,

**{53}** With regard to CYFD's efforts to support Mother's relationship with Child after he moved, as discussed above, CYFD facilitated visitations in New Mexico every other month and attempted to provide support for Mother during telephonic visits. To the extent Mother was unable to obtain information regarding Child's treatment in Nebraska, CYFD testified that it provided updates via court reports as well as during meetings with Mother. CYFD is not required to do "everything possible" but only "compl[y] with the minimum required under law." *Patricia H.*, 2002-NMCA-061, ¶ 28.

**{54}** Mother also argues that CYFD should have informed Mother that participation in DBT was a critical factor to reunification. In making this argument Mother cites *State ex rel. Children, Youth & Families Dep't v. Joseph M.*, 2006-NMCA-029, ¶ 20, 139 N.M. 137, 130 P.3d 198, in which this Court held that CYFD did not provide reasonable efforts to support reunification when it did not inform the father that his failure to separate from the mother could constitute a basis for terminating his parental rights. *See id.* Mother's argument is inapt for two reasons. First, *Joseph M.* is distinguishable because, as this Court pointed out in that case, separation from the mother was never included as a requirement of any of the treatment plans implemented for the father. Conversely, in this case DBT was included as a treatment plan requirement for Mother since February 2015. Second, Mother's argument mistakes Mother's failure to complete the DBT as a critical factor in the district court's decision. As discussed above, the evidence showed that Mother continued to exhibit an inability to recognize potentially dangerous relationships that could affect Child's safety. Because the goal of DBT was to help Mother recognize dangerous situations and make better relationship decisions, her failure to complete the training is concerning. However, the critical factor was not that Mother failed to complete DBT, but rather that she failed to implement the therapy and continued to engage in dangerous relationships.

**{55}** To the extent Mother argues that CYFD should have made more of an effort to place Mother in a DBT group that would allow her to continue working with her individual therapist, we disagree. Mosley attempted to refer Mother to DBT services in 2014 but finding services near Mother's home at the time was difficult. Mosley also testified that many locations offering DBT in Albuquerque were not accepting new patients and did not have openings for group and individual therapy. Mosley further testified that in February 2015 she was able to find a provider in Los Lunas that agreed to provide DBT on an individual basis but could not provide group therapy. The evidence shows that CYFD made reasonable efforts to accommodate Mother's need for therapy near her home. While CYFD could not locate services that provided both individual and group therapy as well as meeting Mother's location needs, "CYFD is only required to make reasonable efforts, not efforts subject to conditions unilaterally imposed by the parent." *Patricia H.*, 2002-NMCA-061, ¶ 27.

---

100 N.M.764, 676 P.2d 1329. However, even if Mother had presented some authority, she raises this argument for the first time in her reply. "[W]e do not consider arguments raised in a reply brief for the first time." *Guest v. Berardinelli*, 2008-NMCA-144, ¶ 36, 145 N.M. 186, 195 P.3d 353. Finally, Mother makes reference in her reply brief to the fact that Child was in CYFD's custody for over two years without an adjudication of neglect. To the extent Mother contends this fact should influence our review here, such contention is not well supported or well developed, and we therefore do not consider it.

**{56}** Mother also argues that CYFD did not provide reasonable efforts to help her find resources needed to separate from Grandmother. In making this argument Mother asserts that CYFD should have made more effort to help her find alternative housing and contends that the district court's decision amounts to a finding of abuse and neglect based on poverty. We first note that the district court found that CYFD had referred mother to public housing therefore Mother's argument is factually inaccurate. However, we also point out that Mother testified that if Child returned to her care, they would live with a friend who would provide housing in exchange for childcare. Mother's position at the time of the TPR hearing was that housing would not be an issue. In this regard, it appears from the evidence that the only impediment to Mother's housing plan was Mother herself.

**{57}** Mosley testified that that Mother informed CYFD that she intended to live with her friend but failed to provide any more information that would allow CYFD to evaluate the location or the friend. Moreover, CYFD did not find out until the TPR hearing that Mother's friend had a history with CYFD. We reiterate that "what constitutes reasonable efforts may vary with a number of factors, such as the level of cooperation demonstrated by the parent and the recalcitrance of the problems that render the parent unable to provide adequate parenting." *Keon H.*, 2018-NMSC-033, ¶ 41. Given Mother's indication to CYFD that she had a home plan in place, further efforts to secure assistance in this regard do not appear to have been a consideration for CYFD. Housing only became an issue because of Mother's lack of cooperation with CYFD.

**{58}** For the forgoing reasons, we conclude there was substantial evidence of a clear and convincing nature that CYFD made reasonable efforts to assist Mother.

**Alternatives to Termination**

**{59}** Lastly, Mother contends that the district court improperly terminated her parental rights when it had the less severe alternative of awarding permanent guardianship to Foster Parents. Mother asserts that the district court should not have terminated Mother's parental rights unless CYFD proved by clear and convincing evidence that permanent guardianship was not a less drastic alternative to termination. Mother appears to argue that the district court should have awarded permanent guardianship to Foster Parents, as opposed to termination of Mother's parental rights, in order to preserve the family unit and to avoid interfering with Mother's fundamental right to raise Child. We disagree.

**{60}** We first note that Mother does not address the fact that CYFD previously proposed permanent guardianship as Child's permanency plan but the district court rejected the proposal and determined that a plan of adoption was in Child's best interest. As such, Mother's argument appears to be factually inaccurate. However, even if the district court had not already considered permanent guardianship, Mother's argument is unpersuasive.

**{61}** Mother characterizes the district court's decision to terminate her parental rights as a "default" determination and cites case law from Colorado and California requiring that trial courts consider less drastic alternatives before terminating parental rights. Mother does not provide relevant New Mexico statutes or case law to show that a similar requirement exists here. Instead, Mother attempts to fold in a strict scrutiny requirement, arguing that because termination implicates a fundamental right the district court is required to explore less drastic remedies. Mother does not explain how New Mexico's termination statute violates strict scrutiny or why our clear and convincing evidence standard is insufficient to protect her fundamental rights. Further, as discussed above, over the course of her long history with CYFD, Mother was the subject of multiple treatment plans, many of which were aimed at reunification. Mother does not explain why any of the previous treatment plans would not suffice to meet her proposed requirement that the court explore less drastic alternatives.

**{62}** We are unpersuaded by Mother's arguments and conclude that the district court was not required to determine whether guardianship was in Child's best interests before terminating Mother's parental rights. CYFD proved by clear and convincing evidence that Child has been neglected, that the conditions and causes of the neglect are unlikely to change in the foreseeable future despite reasonable efforts by CYFD, and that termination is in the best interest of Child.

## CONCLUSION

**{63}** For the foregoing reasons, we affirm the district court's termination of Mother's parental rights to Child.

**{64} IT IS SO ORDERED.**

**JACQUELINE R. MEDINA, Judge**

**WE CONCUR:**

**JENNIFER L. ATTREP, Judge**

**MEGAN P. DUFFY, Judge**